FILED

2014 Jul-31  AM 10:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| **RANDI A. ABBOTT,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 1:12-CV-2244-VEH** |
| | ) |
| **ELWOOD STAFFING SERVICES,** | ) |
| **INC., AND HONDA** | ) |
| **MANUFACTURING OF** | ) |
| **ALABAMA, LLC,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

This is a civil action brought by the plaintiff, Randi A. Abbott, against the defendants, Elwood Staffing Services, Inc. ("Elwood"), and Honda Manufacturing of Alabama, LLC ("HMA"). (Doc. 53 at 1). The Third Amended Complaint was filed on October 24, 2013. It alleges the following claims against both Elwood and HMA: "Failure to Accommodate on the Basis of Pregnancy/Sex – Pregnancy Discrimination Act/Title VII" (Count One); "Unlawful Termination of Employment on the Basis of Pregnancy/Sex–Pregnancy Discrimination Act/Title VII" (Count Two); "Failure to Accommodate on the Basis of Disability–Americans with Disabilities Act" (Count Three); "Unlawful Termination on the Basis of Disability–Americans with

Disabilities Act" (Count Four); "Retaliation on the Basis of Pregnancy/Sex–Pregnancy Discrimination Act/Title VII" (Count Five); "Retaliation on the Basis of Disability–ADA" (Count Six); and "Retaliation on the Basis of Race–Title VII/Section 1981" (Count Seven). (Doc. 53 at 2-13). As to HMA alone, the Third Amended Complaint alleges "Discrimination on the Basis of Race–Title VII/Section 1981" (Count Eight). Against Elwood alone, the Third Amended Complaint alleges "Retaliatory Discharge: § 25-5-11.1, Alabama Code 1975" (Count Nine). All counts arise out of the plaintiff's employment at an HMA facility.

The case comes before the court on the motions for summary judgment filed by the defendants. (Docs. 57, 60). Also before the court is Elwood's objections to portions of the evidence submitted by the plaintiff in opposition to the motions for summary judgment (doc. 67), and HMA's motion to strike portions of that evidence (doc. 69). For the reasons stated herein, Elwood's objections and HMA's motion to strike will both be treated as objections and will be **SUSTAINED in part** and **OVERRULED in part**. In addition, the motions for summary judgment will be **GRANTED**, and this case will be **DISMISSED**.

## I.  THE MOTION TO STRIKE AND THE OBJECTION TO THE PLAINTIFF'S EVIDENCE

### A.  <u>Standard</u>

As explained above, and in this court's order of August 9, 2013 (doc. 50), the court treats both the objections, and the motion to strike, as objections under Federal Rule of Civil Procedure Rule 56(c)(2). Pursuant to that rule, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  The advisory committee's note to Rule 56(c)(2) provide that:

> [An] objection [under Rule 56(c)(2)] functions much as an objection at trial . . . . *The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.*

Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments (emphasis added); *see also, Priest v. U.S. Sec. Associates Inc.*, 5:11-CV-03938-HGD, 2014 WL 800900 at *1 (N.D. Ala. Feb. 28, 2014) (Davis, M.J.); *Riley v. Univ. of Alabama Health Servs. Found., P.C.*, 2:12-CV-346-VEH, 2014 WL 66471 at * 3 (N.D. Ala. Jan. 8, 2014) (Hopkins, J.); *Peeler v. KVH Indus., Inc.*, 8:12-CV-1584-T-33TGW, 2013 WL 3871420 at *8 (M.D. Fla. July 25, 2013) *on reconsideration in part*, 8:12-CV-1584-T-33TGW, 2013 WL 5289733 (M.D. Fla. Sept. 19, 2013) (Covington, J.); *In re Gregg*, 11-40125- JTL, 2013 WL 3989061 * 3 (Bankr. M.D. Ga. July 2, 2013)

3

(Laney, B.J.); *Gates v. HPA Subway, Inc.*, CIV.A. 11-00637-KD-B, 2012 WL 5877978 at *2 n. 5 (S.D. Ala. Nov. 21, 2012) (DuBose, J.).

## B.    The Nature of the Arguments

Despite the clear burden on the plaintiff, she writes:

> "The court is capable of sifting through evidence, as required by the summary-judgment standard, without resort to an exclusionary process, and the court will not allow the summary-judgment stage to degenerate into a battle of motions to strike." *Mann v. Darden*, Civil Action No. 2:07cv751MHT (WO) (M.D. Ala, July 6, 2009). Plaintiff, therefore, is not submitting a line-by-line response to each objection raised by [d]efendants but merely providing the Court with the following to assist the Court in sifting through the evidence.

(Doc. 70 at 1). As will be shown below, the plaintiff's failure to address the defendants' objections "line-by-line," almost always equates to a failure to show that the proffered evidence is admissible as presented or to explain the admissible form of the evidence that is anticipated. In its discussion of the evidence, the court will note where that has happened.

Similarly, the defendants sometimes argue that certain pieces of evidence are inadmissible, but never cite to specific portions of the evidence–instead focusing only on the "facts" submitted by the plaintiff which cite such evidence. Without a specific citation, the court cannot determine what, if anything, needs to be stricken. At other times, the defendants argue that some evidence does not support the proposition for

which it is cited. While that may be a reason for the court not to <u>adopt</u> that proposition, it is not a reason to <u>strike</u> the evidence. These circumstances, too, will be noted by the court in its examination of the evidence.

### C.    <u>The Plaintiff's Handwritten Notes (Doc. 64-2 at 1-4)</u>

As part of her submissions in opposition to the motions for summary judgment, the plaintiff submits several pages of handwritten notes, written by her, which memorialize the events of several days in July and August of 2011. (Doc. 64-2 at 1-4). Both defendants object to the consideration of the notes, in part, because they are hearsay, and because they cannot be made admissible at trial. (Doc. 67 at 3-4; doc. 69 at 5, 7; doc. 71 at 3). The plaintiff does not respond to the argument that the notes are hearsay, stating only:

> Elwood contends that [p]laintiff's notes are not admissible. A review of the document demonstrates, this same document was an exhibit in [p]laintiff's deposition. Plaintiff authenticated this document at her deposition. Honda contends that the notes are irrelevant to proving what caused [p]laintiff's injury, asserting that [p]laintiff is not a doctor. Plaintiff did not have to be a doctor to realize she began bleeding from her vagina while straining while working, as the notes describe.

(Doc. 70 at 2).

The plaintiff has not shown that the notes, and the statements therein, are either not hearsay, or fall within some exception to the hearsay rule. Thus, the plaintiff has failed to satisfy her burden "to show that the material is admissible as presented or to

explain the admissible form that is anticipated," Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments (emphasis omitted).

In addition, the court has reviewed the notes and <u>affirmatively finds</u> that they are hearsay. Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED.R.EVID. 801(c). "Hearsay is inadmissible unless the statement is not hearsay as provided by Rule 801(d), or falls into one of the hearsay exceptions enumerated in Rules 803, 804, and 807." *United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005). The notes fall squarely within the definition of hearsay.

> The general rule is that inadmissible hearsay cannot defeat a motion for summary judgment where there is no indication that it is reducible to a form that would be admissible at trial. *See Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135, *amended in part on rehearing,* 102 F.3d 1118 (11th Cir.1996), *cert. denied,* 520 U.S. 1274, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997).

*Wyant v. Burlington N. Santa Fe R.R.*, 210 F. Supp. 2d 1263, 1275-76 (N.D. Ala. 2002) (Ott, M.J.). Further, portions of the notes constitute double hearsay. For double hearsay to be admissible, "'each part of the combined statements [must] conform [ ] with an exception to the hearsay rule.'" *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1280 (11th Cir. 2009) (quoting Fed.R.Evid. 805). Further still, the notes are unsworn, and the court does not consider unsworn statements. *Dudley v. City of*

*Monroeville,* 446 Fed.Appx. 204, 207 (11th Cir.2011) ("Unsworn statements do not meet the requirements of Rule 56, so the district court could not—and properly did not—rely on the content of the citizen's [unsworn] statement.") (citing *Carr v. Tatangelo,* 338 F.3d 1259, 1273 n. 27 (11th Cir.2003)).

The objections to the notes (doc. 64-2 at 1-4) are **SUSTAINED**. They will be stricken.[1]

### D.   The "Balmer Notes" (Doc. 64-3)

In response to the motion for summary judgment the plaintiff proffers document 64-3, which includes notes made, at least in part, by Alan Balmer, Elwood's Vice-President of its Workforce Solutions division. (Doc. 39-2 at 5(7)).[2]

HMA and Elwood argue that the <u>entire</u> exhibit is unauthenticated, and therefore should not be considered. In its reply brief, HMA cites to *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 113 (11th Cir. 2010), where the Eleventh Circuit, citing to Fed. R. Civ. P. 56(e) as it existed at that time, wrote:

To be admissible in support of or in opposition to a motion for summary

---

[1] The notes have been submitted at least twice, since this is the second time the motions for summary judgment have been filed. All evidentiary rulings herein should be deemed to apply to all copies of any exhibit, no matter its document number.

[2] The citation refers to court document 39-2 at page 5, on which pages 6 through 9 of the Balmer deposition appear. The number in parentheses indicates a citation to page 7 of the travel transcript of the deposition, which in turn appears on page 5 of document 39-2. The court will use this method of citation every time a travel transcript is cited.

judgment, a document must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence. 10 A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil § 2722, at 382-84 (3d ed.1998).

*Saunders*, 360 F. App'x at 113.

First, Balmer testified in his deposition that he created this document, but only down to the black line which appears on page 3. (Doc. 39-2 at 15(48)). He stated that he did not know who put in the information below the black line. (Doc. 39-2 at 15(48)). At least down to the black line on page 3, the document has been authenticated.

Further, authentication is <u>not</u> required at the summary judgment stage. Rule 56(e) was amended in 2010. It has been noted:

> Before the 2010 amendments to the Federal Rules of Civil Procedure, Rule 56 arguably required that all documents submitted to support or oppose a summary judgment be authenticated. *See, e.g., Ellis v. Kilgore,* 27 F.3d 562 (table), 1994 WL 320223, at *1 (4th Cir.1994) ("The party opposing a motion for summary judgment may not merely rest on its pleadings but must demonstrate sufficient evidence, properly authenticated under Rule 56(e), which would be sufficient to support a jury verdict in its favor."); *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 773 ("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment."). Many courts recognized an exception for "when there is no dispute as to the document's authenticity and it is apparent the document can be reduced to admissible, authenticated form at trial." 11 *Moore's Federal Practice* § 56.92[3] (Matthew Bender 3d ed.); *see also Rowell v. BellSouth Corp.* 433 F.3d 794, 800 (11th Cir.2005) ("On motions for summary judgment,

we may consider only that evidence which can be reduced to an admissible form."); *U.S. Aviation Underwriters, Inc. v. Yellow Freight Sys., Inc.,* 296 F.Supp.2d 1322, 1327 n. 2 (In a case involving an unauthenticated bill of lading, the Court stated, "Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial."); *Lexington Ins. Co. v. Western Pa. Hosp.,* 423 F.3d 318, 329 n. 6 (3rd. Cir.2005) ("Our Court has not precluded reliance on unauthenticated documents to oppose a motion for summary judgment, so long as they are ultimately reducible to admissible evidence.) At least one court extended this exception to statements by a pro se litigant that were unsupported by an affidavit. *See Hollingshead v. Windley,* 2008 WL 4809221, at *3 n. 12 (S.D.Ala.2008) ("The Court recognizes, of course, that many of plaintiff's factual representations in her summary judgment submission are not set forth in affidavit form. Notwithstanding this technical infirmity, the Court will consider plaintiff's factual assertions for Rule 56 purposes in light of her *pro se* status and the well-established rule that evidence should be considered on summary judgment if it appears that it can be reduced to admissible form at trial.").

Those cases were decided under former Rule 56. The language relied on for the authentication requirement, in former subsection (e), was omitted in the amended Rule 56. The Court notes that many post-amendment opinions on summary judgment—without acknowledging the amendments—still cite pre-amendment case law . . . for current authentication requirements. *See, e.g,, Jimena v. Standish,* 2013 WL 223131, at *1 (9th Cir.2013) (citing an opinion from 2002, the court stated, "Unauthenticated documents cannot be considered in a motion for summary judgment.").

The majority of the opinions this Court has read from courts construing current Rule 56, however, state the amendments eliminated the authentication requirement and replaced it with a requirement that evidence be presentable in admissible form at trial. As one court put it,

Newly revised Rule 56 of the Federal Rules of Civil

9

Procedure governs the procedure by which the court must review objections to the admissibility of evidence presented in connection with a motion for summary judgment. In some respects, the 2010 amendment to Rule 56 works a sea change in summary judgment procedure and introduces flexibility (and consequent uncertainty) in place of the bright-line rules that are obtained previously. Former Rule 56(e) contained an unequivocal direction that documents presented in connection with a summary judgment motion must be authenticated:

> If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.

FED. R. CIV. P. 56(e)(1) (2009 version). Relying on this language, the United States Court of Appeals for the Sixth Circuit routinely held that unauthenticated documents could not be used to support a motion for summary judgment. *See, e.g., Moore v. Holbrook,* 2 F.3d 697, 698–99 (6th Cir.1993). As recently as 2009, the Court of Appeals stated that unauthenticated documents do not meet the requirements of Rule 56(e) and must be disregarded. *Alexander v. CareSource,* 576 F.3d 551, 558–59 (6th Cir.2009).

These authorities must be read carefully, however, in light of the 2010 amendments to Rule 56, which eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated. Rather, the amended Rule allows a party making or opposing a summary judgment motion to cite to materials in the record including, among other things, "depositions, documents, electronically stored information, affidavits or declarations" and the like. FED. R. CIV.P. 56(c)(1)(A). If the opposing party believes that such

materials "cannot be presented in a form that would be admissible in evidence," that party must file an objection. FED. R. CIV.P. 56(c)(2). Significantly, the objection contemplated by the amended Rule is not that the material "has not" been submitted in admissible form, but that it "cannot" be. The comments to the 2010 amendments make it clear that the drafters intended to make summary judgment practice conform to procedure at trial. "The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike." FED. R. CIV. P. 56 (2010 Advisory Committee comments). The revised Rule therefore clearly contemplates that the proponent of evidence will have the ability to address the opponent's objections, and the Rule allows the court to give the proponent "an opportunity to properly support or address the fact," if the court finds the objection meritorious. FED. R. CIV. P. 56(e)(1). Thus, the amendment replaces a clear, bright-line rule ("all documents must be authenticated") with a multi-step process by which a proponent may submit evidence, subject to objection by the opponent and an opportunity for the proponent to either authenticate the document or propose a method to doing so at trial.

*Foreward Magazine, Inc. v. OverDrive, Inc.,* 2011 WL 5169384, at *2 (W.D.Mich.2011).

This is a reasonable interpretation of current Rule 56 given the new language, the omission of the old language, and the policy behind summary adjudication of minimizing time and expense when the outcome of a case is obvious or depends only on matters of law. Thus under current Rule 56, an objection cannot be based solely on evidence not being authenticated—the objection must be that evidence *cannot* be presented in admissible form, not that the evidence *has not* been presented in admissible form. *See, e.g., Slate v. Byrd,* 2013 WL

1103275, at * 2 (M.D.N.C.2013) ("Because [defendant] has not filed an objection contending that the cited material *'cannot be* presented in a form that would be admissible in evidence,' no basis exists for the Court to decline consideration of the material at issue.").

*In re Gregg*, 11-40125- JTL, 2013 WL 3989061 at *2-4 (Bankr. M.D. Ga. July 2, 2013) (Laney, C.B.J.). The court agrees with this well reasoned approach, and notes that the defendants do not argue that the document <u>cannot</u> be authenticated. The objections, to the extent that they are based upon the document not being authenticated, are **OVERRULED**.[3]

HMA argues:

> Doc. 63 [the plaintiff's response to the motions for summary judgment] generally cites to "Balmer Notes" without referencing a specific part of page number. Without a specific reference, they are impermissibly vague. . . . While unclear, HMA references the part(s) of "Balmer Notes"

---

[3] HMA also specifically references the section of the exhibit after the line on page three writing:

> 5.      Regarding "Balmer Notes" p. 3 (Doc. 63, p. 9, Fact 12), page three (D00103) of "Balmer Notes" is not certified, or otherwise authenticated; Balmer testified he did not draft page three (D00103), there is no evidence indicating who drafted D00103, and, thus, D00103 is inadmissible to prove Josh Wade received light duty.

(Doc. 69 at 10). Elwood similarly argues:

> 13.   The notes found in [p]laintiff's Exhibit 3 that appear below the line on the third page are inadmissible and should not be considered by the Court nor should any of the argument of [p]laintiff which relies on said notes.

(Doc. 67 at 7). Again, because HMA and Elwood do not argue that these portions of the exhibit <u>cannot</u> be authenticated, the arguments fail.

to which it believes [p]laintiff refers for each citation.

(Doc. 69 at 8, n. 20). HMA then argues:

A.    The "Balmer Notes" [p]laintiff cites are due to be stricken because they are <u>conclusory</u>, <u>lack foundation</u>, are <u>based on hearsay</u>, are <u>irrelevant/immaterial</u>, <u>are not authenticated</u>, and are not <u>cited with specificity</u>.

1.    Regarding "Balmer Notes" pp. 1-3 (Doc. 63, Response to HMA Fact 48), [p]laintiff's cited evidence provides **no foundation** to support her conclusion that "everyone understood that [p]laintiff suffered an on-the-job injury for which she sought compensation and accommodation, but which [d]efendants refused to provide," and knowledge of an injury cannot be imputed to any actors. Further, it is, *at least*, **double hearsay** inadmissible to show the truth of the matter asserted - [d]efendants' knowledge of an on-the-job injury - and **contradicts her sworn deposition testimony**.

2.    Regarding "Balmer Notes" p. 1, (Doc. 63, p. 9, Fact 11), [p]laintiff offers only **hearsay** to conclude that she "started spotting after doing her process."

3.    Regarding "Balmer Notes" p. 3 (Doc. 63, p. 10, Fact 19), [p]laintiff's cited evidence fails to set out who knew, when they knew, and how they knew an injury caused [p]laintiff's pregnancy-related impairment, and is **conclusory** and **lacks foundation**. Further it is **double hearsay** inadmissible to show the truth of the matter asserted - that [d]efendants knew an injury caused [p]laintiff's pregnancy-related impairment.

4.    Regarding "Balmer Notes" p. 1-3 (Doc. 63, pp. 9, 12, Facts 10, 32), [p]laintiff's cited evidence provides **no foundation** for concluding Balmer knew [p]laintiff suffered an on-the-job injury, and knowledge cannot be imputed to him. Further, the notes are hearsay inadmissible to show the truth of the matter asserted.

13

(Doc. 69 at 7-10) (footnotes omitted) (emphasis in original).  Except in two footnotes,
HMA never cites to the exhibit in question. The objection's reference to the plaintiff's
brief in opposition to the motion for summary judgment provides no help either,
since, as noted by the defendant, in her brief the plaintiff only generally cites to her
exhibit without a pinpoint cite.[4] To the extent that the exhibit itself is attacked, and
to the extent that it is impossible to determine the exact portion of the exhibit which
the defendants attack, the objections are **OVERRULED**.

---

[4] As will be noted in the portion of this opinion dealing with the motion for summary
judgment, the defendants are correct that such references are inadequate. *See* FED. R. CIV. P.
56(c) (parties must cite "to particular parts of materials in the record."); doc. 5 at 16 ("All
statements of fact must be supported by specific reference to evidentiary submissions."), 17
("Any statements of fact that are disputed by the non-moving party must be followed by a
specific reference to those portions of the evidentiary record upon which the dispute is based."),
18 ("Each statement of allegedly disputed facts must be followed by specific reference to those
portions of the evidentiary record which both support and contradict the alleged fact."). HMA
also moves to strike the exhibit in part because of these general cites. (Doc. 69 at 11). While that
is not a basis for striking the exhibit, it is a basis for refusing to consider the evidence cited.

HMA may also be arguing not that the exhibit is inadmissible, but that it does not support
some proposition for which it is cited. Elwood makes that argument where it states:

11. In [p]laintiff's statement of facts [p]laintiff asserts that a portion of Balmer's
Notes indicate that he knew [p]laintiff was injured at work. (Doc. 63 ¶¶ 10, 19,
32, 36). Plaintiff's cite to inadmissible evidence provides no foundation to support
her conclusion in her argument on p. 15 that Balmer had knowledge of [p]laintiff
suffering an on-the-job injury.

12. Also, [p]laintiff cites to the notes on pp. 9 and 13, [p]laintiff's purported facts
numbered 12, 35, 37 – 39 and in her argument on p.15) regarding the treatment of
others.

(Doc. 67 at 6-7). To the extent that a reference to an exhibit does not support a "fact" proffered
by a party, the court can and will address that issue in its statement of facts on the motion for
summary judgment, without striking the exhibit.

As indicated, HMA includes two footnotes which <u>do</u> reference a portion of the exhibit. The first is footnote 24, which references the portion of the notes which reads: "Randi Abbott told TC Issac [Henderson] that she started spotting after doing her process." (Doc. 69 at 9, n. 24) (quoting 64-3 at 1). The defendant argues that this statement is hearsay to the extent that it is offered to prove that the plaintiff actually started spotting after doing her process. The plaintiff does not address this argument in her response to the motion/objection, saying only that HMA "provides no basis for calling it [hearsay]." (Doc. 70 at 3). She has failed to carry her burden to show that this statement is either not hearsay or falls within some exception to the hearsay rule. Further, the court affirmatively finds that the statement is hearsay that falls within no exception. To the extent that the plaintiff wishes to use the evidence to show that she actually was spotting, and when it occurred, the objections are **SUSTAINED** and the evidence will be stricken.

The only other specific section noted by HMA appears in footnote 26, which reads: "She presented a 'doctor's note' on 8/11/11 (the note is dated 8/10/11) that indicates Randi is pregnant and needs to empty her bladder more often and will need to be able to use the restroom as needed.") (Doc. 69 at 9 n. 26) (quoting 64-3 at 2). Again, the defendant argues that, to the extent that the statement is offered to prove what was stated in the note, it is hearsay. Again, the plaintiff does not respond to this

15

argument. Because the plaintiff has failed to carry her burden on this issue, and because the court affirmatively finds that the statement regarding the contents of the doctor's note is hearsay, subject to no exceptions, the objection is **SUSTAINED**. The statement will be stricken to the extent it is cited to prove the contents of the note.[5]

Elwood writes: "The portions of Balmer's notes which he did not draft and the author of which is unknown, is hearsay." (Doc. 67 at 7). Assuming that is true, because the objection does not argue that that portion of the document <u>cannot be made admissible</u>, it fails. *In re Gregg*, 2013 WL 3989061 at *2-4.[6]

### E.   <u>The Plaintiff's Injury Report (Doc. 64-1 at 1)</u>

Like the arguments presented by the defendants to strike the Balmer Notes, the arguments presented by HMA in opposition to the plaintiff's injury report also appear to mainly argue that the report does not support the proposition for which it is cited in the plaintiff's brief. (Doc. 69 at 4 (¶1), 5 (¶¶ 2-3)). Again, to that extent, the court

---

[5] To the extent that HMA argues that the exhibit does not support a proposition for which it is cited, that argument will be addressed in the section of this opinion outlining the facts of the case. HMA's remaining argument as to these notes is:

> The remaining portions of "Balmer Notes" that were not cited lack foundation, are based on hearsay, contradict sworn deposition testimony, and/or are irrelevant/immaterial; they must be stricken.

(Doc. 69 at 11). This vague argument again addresses no specific portion of the exhibit and is therefore **OVERRULED**.

[6] For the same reason, and in addition to the reasons already cited, Elwood's similar argument at paragraph 13 of document 67 fails.

will address those arguments when considering which facts to include in its opinion on the motion for summary judgment. Elwood's objections include the following paragraph:

> 14. The following paragraphs from [p]laintiff's brief rely on [p]laintiff's Exhibit 1 and should be struck or disregarded: See Doc. 63; Opposition to Elwood's Statement of Facts, p. 3 (¶¶ 12-16), p. 4 (¶¶ 41-42), p. 5 (¶ 48); Opposition to HMA's Statement of Facts, p. 7 (¶ 48); [p]laintiff's Statement of Facts, p. 9 (¶ 8). Plaintiff additionally makes allegations based on the Injury Report within her brief at page 15 and this reference should similarly be struck or disregarded.

(Doc. 67 at 7(¶ 14)). As far the court can tell, this paragraph, which is Elwood's first paragraph in this section, gives no reason for striking anything. Otherwise, it appears that the defendants specifically attack the report only to the extent that it is cited to show that the plaintiff began spotting <u>because</u> she was straining to install doors. (Doc. 67 at 7(¶15); doc. 69 at 4(¶2), 5(¶3).

HMA argues that the report is "double hearsay, no exception applies, and cannot be used to prove that 'straining to install doors caused [p]laintiff to experience bleeding.'" (Doc. 69 at 4). The plaintiff does not respond to this argument, except to say that HMA "does not explain why it attaches [this] label to the report." (Doc. 70 at 3-4).

The court disagrees with the plaintiff's argument that HMA has failed to explain why the report is hearsay. It identified the report (which is only one page

long) and argues that it cannot be used to prove that "straining to install doors caused [p]laintiff to experience bleeding." This is a clear reference to three sections of the report. The first describes the "nature of the injury" as "abdominal strain caused spotting." (Doc. 64-1 at 1). The second described the task the plaintiff was doing as "while straining to install doors noticed spotting." (Doc. 64-1 at 1). The third notes that the injury occurred "from straining to install doors." (Doc. 64-1 at 1). It is clear that HMA is arguing that, to the extent that these portions of the report are cited to prove that the plaintiff started spotting <u>because</u> she was straining to install doors, they are hearsay. The plaintiff has made no attempt to show that the report is not hearsay, or to show that it falls within some exception to the rule. Further, the court affirmatively finds that, in the format presented,[7] the document is hearsay, falling within no exception to the rule.

---

[7] One might argue (although no one has) that this document is a business record, falling with an exception to the hearsay rule. Of course, to fall under that exception, the following must be shown:

> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6). No such showing has been made, argued, or even suggested.

Even assuming that the report is not hearsay, the report states that it was completed based upon information provided by the plaintiff. (Doc. 64-1 at 1). The plaintiff's conclusion, contained in the report, as to why she began spotting, is inadmissible expert testimony from a lay witness. *See, Wingster v. Head*, 318 F. App'x 809, 815 (11th Cir. 2009) ("[M]edical causation . . . presents a technical and scientific issue that requires the specialized knowledge of an expert medical witness.") (citing Fed. R. Evid. 701, 702; *Webster v. Offshore Food Serv.,* 434 F.2d 1191, 1193 (5th Cir.1970)); *E.C. ex rel. Crocker v. Child Dev. Sch., Inc*., 3:10-CV-759-WKW, 2011 WL 4501560 at *9 (M.D. Ala. Sept. 29, 2011) ("[A] lay witness [cannot establish medical causation] . . . or provide evidence that could be used as the basis for an inference of medical causation."). This argument too was presented by both defendants. (Doc. 67 at 7; doc. 69 at 5). Again, the plaintiff does not respond to this specific argument and so has not carried her burden on this issue. The objections to the report are **SUSTAINED**, and the report will be stricken to the extent that it is cited to prove the <u>cause</u> of the plaintiff's spotting.

### F. <u>The Plaintiff's EEOC Charge (Doc. 64-4)</u>

The plaintiff cites statements made in her narrative attached to her EEOC charge. She insists that the charge is properly authenticated and has been signed under penalty of perjury. However, it has been noted:

19

> "EEOC charges, grievances, and claims, including the investigations of such charges, grievances and claims of the [p]laintiff and other former or current employees including the position statements of the complainants and the resolution or settlement of any such charges, grievances, or claims are inadmissible for a number of reasons, including on the basis of relevance, a Rule 403 balancing test, and hearsay." *Frazier v. Ind. Dep't of Labor,* No. IP01–0198–C–T/G, 2003 WL 21254424, at *4 (S.D.Ind. Mar. 17, 2003) (citing *Tulloss v. Near N. Montessori Sch. Inc.,* 776 F.2d 150, 154 (7th Cir.1985)); *see also Stolarczyk v. Senator Int'l Freight Forwarding, L.L.C.,* 376 F.Supp.2d 834, 841–42 (N.D.Ill.2005) (noting presumption of inadmissibility with EEOC charges and refusing to admit the plaintiff's charges even under the residual hearsay exception); *Walker v. Fairfield Resorts,* No. 3:05–0153, 2006 WL 724555, at * 8 (M.D.Tenn. March 21, 2006) (noting that "an EEOC charge is hearsay and, even though sworn to under the penalty of perjury, inherently unreliable because the charge is drafted in anticipation of litigation") (citation omitted).

*Johnson v. AutoZone, Inc.*, 768 F. Supp. 2d 1124, 1134 at n. 82 (N.D. Ala. 2011) (Smith, J.); *see also, Roxbury-Smellie v. Florida Dep't of Corr.*, 324 F. App'x 783, 785 (11th Cir. 2009) ("The statements made by [EEOC interviewees], did not fall into the public records exception because they were not a factual finding made by the EEOC investigator, but rather a record of the interviews conducted by the EEOC investigator. . . . Accordingly, the district court did not abuse its discretion when it determined the interview notes did not fall within the hearsay exception for public records."). The plaintiff does not explain how the charge could be reduced to an admissible form at trial. The objections to the admissibility of the charge are **SUSTAINED**, and the charge will be stricken.

### G.      Statements About Co-Workers's Job Duties

The defendants attack the following sections of the plaintiff's deposition testimony:

Q. So you're saying you experienced stress from seeing one pregnant employee being treated more favorably than you?

A. Yes, because she had lighter duties. They were treating her with respect on how she was concerned about her unborn child. And still remaining with difficult tasks for me caused my injury, straining because of a dysfunctional machine that I reported that was -- needed adjusting. I mean, just the stress of it all.

Q. And that was Jessica, right?

A. Yes.

Q. What were her lighter duties?

A. Her jobs -- they would give her the easier jobs of her tasks, the ones that could meet a pregnant woman's needs.

Q. What processes did she do before she was pregnant?

A. I don't know the names of them, but just easy stuff like putting a little seal on, a door seal, just real simple stuff.

Q. Before she was pregnant, what job processes did she work on?

A. She had those and then she had some more harder ones that they would tell me about. I never seen them.

Q. Who told you about those?

A. Everyone from the zones. They discussed the task and difficulty

21

levels of our jobs and ways to make it better. That's how changes would be made is if you discussed it with fellow workers.

Q. So if I understand you correctly, you're saying Jessica had some processes that were difficult before she was pregnant?

A. Yes.

Q. What were those processes?

A. I couldn't tell you the names of them.

Q. And how do you know she had those difficult processes?

A. Just say we had four processes, two out of her four were up there in the difficulty level, like more exhilarating than the other ones. She's pregnant down to two processes, rotating them every two hours, the two processes, that's what I mean.

Q. How do you know that?

A. Because I would ask.

Q. Who did you ask?

A. Her.

Q. So did her processes change when she got pregnant?

A. Yes, it become more easier. The further she got along the more difficult it was for her to do anything.

Q. And what changed?

A. The difficulty level, like her treatment in general.

Q. But specifically with regard to her job duties, what changed?

22

A. The difficulty level of her job, like her processes would become easier is what I'm trying to say.

Q. And what did you observe or what do you know about her processes becoming easier specifically?

MR. PARKER: Objection, asked and answered. You can answer.

A. Just -- I'm saying like from two hard processes, two easy processes, just sticking to two easy ones, not ever having to do the hard ones is what I'm trying to mean.

Q. And she is the one who told you this was happening?

A. Yes.

MR. PARKER: Objection, asked and answered. You can answer.

A. Just -- I'm saying like from two hard processes, two easy processes, just sticking to two easy ones, not ever having to do the hard ones is what I'm trying to mean.

Q. And she is the one who told you this was happening?

A. Yes.

Q. When did she tell you that?

A. I mean, throughout the time that I was there because she noticed the treatment that I was receiving so she would talk to me.

Q. And who were her supervisors?

A. I can't remember his name. It was the same team manager but a different supervisor.

Q. So Ricky Sanders was her team manager also?

A. Yeah.

Q. Any other facts that you base your claim on that you were discriminated based on your pregnancy?

A. That's it.

(Doc. 62-1 at 24(89)-25(92)). It is clear from this testimony that the plaintiff had no personal knowledge of the other processes that "Jessica" was doing. Elwood argues that the only basis for the plaintiff's claim that Jessica (last name unknown) was treated more favorably than her is other persons' inadmissable hearsay statements that Jessica performed lighter duties during that time.

The plaintiff argues that these statements are not hearsay because Rule 801(d)(2) of the Federal Rules of Evidence provides that a statement offered against an opposing party, as this one is, is not hearsay if it is made by the party's "employee on a matter within the scope of that relationship and while it is existed." The court notes that this rule only protects such statements once a proper foundation is laid. *See, Champ v. Calhoun Cnty. Emergency Mgmt. Agency*, 226 F. App'x 908, 912 (11th Cir. 2007)(statements inadmissible if "made by someone [only] generally identified as an agent or employee"). There is no foundation for citing the statements of "[e]veryone from the zones." Such a vague reference does not satisfy the plaintiff's burden.

Similarly, although "Jessica" is at least identified, she is only identified by a first name, and, although she, like the plaintiff, performed "processes," her job title is not identified in the testimony, and the plaintiff has pointed to no other evidence which would provide a foundation for her statement.[8] Further, the testimony itself is vague as to the exact nature of the processes "Jessica" performed and how they were "easier." The plaintiff even says: "I couldn't tell you the names of them," and only refers to them with phrases such as the "easy ones." No proper foundation is laid for the admission of these statements either. *See, Harrison v. Formosa Plastics Corp. Texas*, 776 F. Supp. 2d 433, 441 (S.D. Tex. 2011) ("Harrison does not identify the names or job titles of any of the 'current Formosa employees' who allegedly made the statements in question. Harrison also fails to establish that these employees were authorized to speak on behalf of Formosa, or that the statements were otherwise made during the course of the speakers' employment."). The statements of these employees are hearsay and will be stricken.[9]

## II.     THE MOTIONS FOR SUMMARY JUDGMENT

### A.     <u>Standard</u>

---

[8] Indeed, the plaintiff admits that she did not work in the same zone or perform the same processes as Jessica. (Doc. 61 at 14-15 (¶ 51) (fact admitted in the plaintiff's response to motion for summary judgment (doc. 63))). Jessica's statements are therefore also not relevant.

[9] HMA's remaining arguments appearing at doc. 69 pp. 13-15, will be dealt with when the court addresses the statement of facts section of the motion for summary judgment.

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might

26

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the

27

non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## B.   Facts

### 1.   *HMA and Elwood*

HMA employs approximately 4,000 individuals at its Lincoln, Alabama plant. Certain employees, called "Process Associates" and "MSTs" by the parties, work on the assembly line, and are engaged in the daily tasks of assembling Honda Odyssey, Pilot, Accord, and Ridgeline vehicles. Process Associates perform "processes." Although not specifically defined by the parties, based upon their usage of the term

in their filings, it is clear that a "process" is a job, comprised of several steps, which a worker does over and over. Some workers at HMA are permanent employees of that company. Others are contingency workers provided by an outside staffing agency.

Elwood serves as a staffing agency for HMA, and provides a contingent workforce based on the labor needs of HMA. Elwood associates work with HMA associates to perform their production processes. Individuals who work directly for HMA have no relationship to Elwood. They are subject to different terms and conditions of employment than Elwood associates who work for HMA. (Doc. 59-5 at 3). HMA can bring information to Elwood about Elwood associates, which could be taken into consideration on employment issues. (Doc. 39-2 at 16(52)). However, Elwood is responsible for hiring, disciplining, compensating, and terminating its temporary associates assigned to HMA. Elwood employs on-site supervisors at HMA that supervise Elwood's temporary associates assigned to work at HMA. HMA plays no role in the administration of FMLA leave to Elwood associates. It is undisputed that, at all times during an assignment, Elwood associates remained employees of Elwood and could have their assignment ended only by Elwood.

Elwood associates who complete a certain number of hours, fulfill attendance requirements, and have satisfactory performance, may submit an application for employment at HMA, but are not guaranteed a position. Other than to provide HMA

29

with performance evaluations, Elwood has no role in the permanent placement of employees with HMA. (Doc. 39-2 at 16(53)).

### 2.   *Employment Policies of HMA and Elwood*

At all relevant times, HMA has had in effect an Equal Employment Opportunity Policy and Mutual Respect Policy, both of which strictly prohibit any form of discrimination and harassment in all terms and conditions of employment, including, but not limited to, discrimination and harassment based upon pregnancy, sex, race, and disability. The policies require an associate that believes he or she has been the target of, or who has observed, any form of discrimination or harassment to immediately report it to his or her Team Manager, Department Manager, an Associate Relations Representative, or the Department Manager of Human Resources. The policies also prohibit any form of retaliation against an associate who reports a concern about discrimination or harassment. The policies are found in HMA's Associate Handbook, and are distributed to associates upon hire.

Elwood trains all new hires assigned to HMA on discrimination and harassment and how to report such claims. At the outset of their assignment, Elwood associates receive an Assignment Guidebook and in-person training, which explains HMA's Mutual Respect Policy and tells them to whom they must report concerns. Elwood associate concerns must be immediately reported to the Elwood On-Site Manager or

On-Site Supervisor, the HMA Team Manager, or an HMA Associate Relations Representative. Elwood's Assignment Guide Book ("the Guide Book"), which is provided to all new Elwood hires assigned to HMA, prohibits harassment on any unlawful basis as well as unlawful retaliation. The Guide Book contains a disclaimer making clear that: "[a]ssignments can end at any time;" Elwood "reserves the right to alter its policies and procedures at any time without notice;" and "[n]othing in this guide book should be considered a contract or a guarantee of employment by either Elwood Staffing and/or HMA. All HMA . . . workforce assignments are continent and based strictly upon a business need for certain types of manpower." (Doc. 36-3 at 17). It is undisputed that the Guide Book in no way establishes any obligation on Elwood's part to pay for time off work due to medical visits or to pay medical bills for on-the-job injuries; it only speaks to the issue in terms of requiring that employees report injuries immediately.

HMA provides a restriction placement search for associates who may be ADA-qualified or have permanent restrictions due to an occupational injury. HMA only creates so called "light duty" assignments for associates who have suffered compensable on-the-job injuries. (Doc. 62-5 at 3).[10]

_____

[10] The plaintiff, in response to the motion for summary judgment, writes: "[HMA] has admitted that it provides light duty only to those who suffer on-the-job injuries." (Doc. 63 at 12).

31

Elwood provides light duty in instances where its employees suffer an on-the-job injury, of which it is made aware, who need restrictions in order to continue working. (Doc. 36-4 at 19(65)). Additionally, Elwood engages in an interactive process to determine whether it can reasonably accommodate qualified individuals with disabilities as defined by the Americans With Disabilities Act. (Doc. 59-5 at 3). With regard to non-work-related medical conditions, including pregnancy, Elwood tries to work with its client locations to see if the associate's personal restrictions can be met, but it does not have a formal "light duty" program for personal medical restrictions. (Doc. 36-4 at 20(66)). Elwood handles requests for personal medical restrictions related to pregnancy in the same manner it handles requests for personal medical restrictions related to other non-work-related condition. (Doc. 59-5 at 3).[11, 12]

---

[11] Alan Balmer was Elwood's project plant manager at HMA. Balmer testified that he was unaware of any employee who had "been accommodated because of their pregnancy." (Doc. 36-4 at 20(66)).

[12] The plaintiff disputes the statements in this paragraph saying:

12-16. Disputed. As set out at length in [p]laintiff's statement of facts, [p]laintiff was not provided light duty after she suffered a work injury, Elwood did not accommodate [p]laintiff because of her disability or pregnancy, did not treat the restrictions required because of [p]laintiff's pregnancy and the complications to her pregnancy because of a work injury in the same manner it handled the work restrictions of Josh Wade, a male worker, and [p]laintiff's condition constituted a disability under the expanded scope of the ADA in light of the 2008 Amendments. (Pl.'s Depo., pp. 49-51, 63, 69-71, 104-05, 107-08, 109-10, 125-26, 129, 142-43, 145, 164, 210-12, 219-21; Pl.'s Exhibit 1; Pl.'s Ex. 2; Pl's Ex. 3; Pl.'s Ex. 4;

### 3.   *The Plaintiff's Assignment at HMA*

The plaintiff began working at the HMA facility on or about July 15, 2010, in the position of "MST" or manufacturing support technician.[13] She was assigned to work in HMA's Assembly Frame Department, Line 2, Zone 23. She estimates another eight to ten Elwood employees, and eight to ten HMA employees, worked alongside her during her shift.

MSTs generally were assigned four different two-hour processes each shift. The processes were rotated between employees "for ergonomical purposes because being on certain processes for a certain period of time prolonged can cause serious damage." (Doc. 39-1 at 76(295)). Accordingly, every 2 hours the plaintiff would stop

---

Balmer Depo., p. 60, 62).

(Doc. 63 at 3).  This general denial of several facts is inadequate.  The court's summary judgment scheduling order clearly states:

> The non-moving party's response to the moving party's claimed undisputed facts shall be in separately numbered paragraphs that coincide with those of the moving party's claimed undisputed facts. Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

(Doc. 5 at 17) (emphasis in original).  The court will not search through the record in an attempt to determine which evidence disputes what fact.

[13] As noted above, her position is called by the parties both "Process Associate" and "MST."

working on one process and rotate to another. The plaintiff testified that the process rotation schedule was "supposed to be generated by [a] computer program," but that during her assignment it was done "[w]ith physical changes . . . to it." (Doc. 39-1 at 76(294)). She explained that "physical changes" meant "[r]emoving people off line through the system to make sure the rotation was still balanced out." (Doc. 39-1 at 76(294)). Elwood plays no role in the process-rotation schedule or in the assignment of processes.[14]

At different times while she was at HMA, the plaintiff worked on three models of vehicles: Accords, Pilots, and Ridgelines. She was certified to perform five processes which she identified as: "left front door," "left roof rail," "assist side cowl top," "installing DVD players," and "placing vehicle identification numbers on the vehicles." Her processes required her to lift, bend, and climb in and out of vehicles on a rotating basis. She did these same 5 processes the entire time she worked in the HMA plant. (Doc. 39-1 at 16(56-57)). As to what processes her co-employees were certified, or "signed off on" to perform, the plaintiff stated: "Like we all signed off on a list, but unless the same person did the same thing you wouldn't know it because

---

[14] The plaintiff disputes this fact, saying that she "witnessed Jessica . . . being placed on easier processes during her pregnancy." (Doc. 63 at 3). First, as discussed above, evidence regarding Jessica's processes will be stricken. Second, whether or not Jessica was placed on easier processes does not prove that Elwood played a role in such assignment. Indeed, it is unclear whether Jessica was employed by Elwood or HMA.

you wouldn't be seeing it assigned." (Doc. 39-1 at 76(294)).[15] While working at HMA, her work was overseen by her Team Coordinator, Isaac Henderson, who was an HMA employee and white. Henderson reported to Ricky Sanders, Team Manager, who was also a white HMA employee.

Elwood too had direct supervision over the plaintiff while she worked at the HMA plant. Elwood employed Alan Balmer, who is white, as a project plant manager at HMA. Additionally, Elwood employed several persons in the position of "On-Site Supervisor" ("OSS"), including Casey Green, Robin Webb, B.B. Campbell, and Amanda Souza. Green, Webb, Souza, and Campbell are all white. On-Site Supervisors are responsible for administering Elwood's policies and overseeing the staffing program on a daily basis. Balmer stated in his deposition that only "Elwood," and particularly Green, Webb, Souza, Campbell, and himself, had the authority to issue discipline to the plaintiff. (Doc. 39-2 at 16(52-53)).

When the plaintiff began her position at HMA she understood that she was not guaranteed employment with HMA. She received Elwood's Assignment Guidebook and received training on HMA's Mutual Respect Policy and reporting procedures. She understood that she could report any concerns to Elwood's On-Site Supervisors,

---

[15] The plaintiff testified that she knew that "Jessica" was given easier work to do when she was pregnant because Jessica told her so. (Doc. 39-1 at 24(87)-25(92)). This evidence will be stricken for the reasons noted above.

her HMA Team Manager or HMA Associate Relations.

### 4. *Plaintiff Requests Light Duty Due to Pregnancy*

Plaintiff has no complaint about her treatment by Elwood or HMA prior to April 2011. At that time, she learned that she was pregnant and informed Henderson shortly thereafter.   Thereafter, before July 21, 2011, but after she became pregnant,[16] she "complained [to Henderson] about . . . being rotated to do doors twice a day when [she] had five . . . processes." (Doc. 39-1 at 19(69)). She complained "because it's difficult when you're doing doors twice. It really is strenuous." (Doc. 39-1 at 19(69)). Henderson told her that "if [she] had any complaints about the activity being too difficult that [she] needed to talk to Ricky Sanders." (Doc. 39-1 at 19(69)). She spoke to Sanders and "requested to take it a little bit easy on the doors because I was pregnant and it was difficult." (Doc. 39-1 at 19(69)). In response, Sanders told her that "if [she] didn't like it that [she] could go home and go home means quit." (Doc. 39-1 at 19(69)).[17]

---

[16] The plaintiff stated in her deposition that she had this conversation "before [her] injury." (Doc. 39-1 at 19(69)).

[17] The plaintiff proffers a fact which states that this statement was made "[w]hen Plaintiff requested accommodation because of her injury." (Doc. 63 at 13). That is incorrect. The plaintiff was clear in her deposition that this comment was made <u>before</u> her injury. However, elsewhere in her deposition she recounts nearly the exact same conversation that she says occurred <u>after</u> the incident of July 21, 2011.  (Doc. 39-1 at 29(106-107)). The court assumes that the plaintiff is referring to two separate conversations. The plaintiff also offers the following facts:

35. Elwood gave Josh Wade workers' compensation benefits but refused them to

5.    *The Events of July 21, 2011*

The plaintiff states that she was able to perform all functions of her job up until

July 21, 2011. (Doc. 39-1 at 28 (103-104)). On July 21, 2011, the plaintiff began her

shift at 4:30 p.m. Late in her shift, the plaintiff had to strain while installing doors on

a Ridgeline vehicle. She later went to the restroom and discovered that she was

experiencing vaginal bleeding. (Doc. 39-1 at 38(143)).[18]  She reported the bleeding

to Henderson and filed an injury report.[19]  Henderson told her to go to the on-site

_____

[p]laintiff. (Pl.'s Ex. 3).

36. Although Balmer pled ignorance of [p]laintiff's work injury, his notes indicate
that he was aware of the nature and cause of her injury, as do [d]efendants'
documentation of [p]laintiff's injury. (Pl's Ex. 3, Pl.'s Ex. 1).

(Doc. 63 at 13). Exhibit 3 is Balmer's notes. (Doc. 64-3). Exhibit 1 is the aforementioned "injury
report." (Doc. 64-1). As noted above, document 64-1 will be stricken to the extent that it is cited
to prove the cause of the plaintiff's bleeding was an injury at work. The vague and general
reference to exhibit 3, without pinpoint citation or further explanation, is insufficient. Rule 56 of
the Federal Rules of Civil Procedure requires citation "to particular parts of materials in the
record." FED. R. CIV. P. 56(c)(1)(A). Further, this court's summary judgment scheduling order
has similar requirements. Doc. 5 at 16 ("All statements of fact must be supported by specific
reference to evidentiary submissions."), 7 ("Any statements of fact that are disputed by the
non-moving party must be followed by a specific reference to those portions of the evidentiary
record upon which the dispute is based."), 18 ("Each statement of allegedly disputed facts must
be followed by specific reference to those portions of the evidentiary record which both support
and contradict the alleged fact."). The proffered facts will not be included.

[18] The plaintiff proffers the following fact: "5. Plaintiff was injured while working
because of straining to put on doors. ([Doc. 39-1 at 38(142)])." (Doc. 63 at 8). The plaintiff
testified that she was straining to put on the doors, and then afterwards went to the restroom and
noticed she was bleeding. The citation does not support the assertion that she started bleeding
because of the straining. The fact will not be included.

[19] This fact, offered by the plaintiff, originally included a statement that she reported "that
she was bleeding from her vagina because of the straining, and filed an injury report." (Doc. 63 at

medical clinic, and the plaintiff complied.[20] The on-site clinic said that it could not adequately meet the needs of a pregnant woman and recommended that the plaintiff seek emergency treatment.[21]

The plaintiff was seen by her outside doctor that night. The plaintiff testified that her doctor gave her "[j]ust basic treatment to make sure that everything was okay." (Doc. 39-1 at 56(217)). The doctor "said I could go back to work, just whatever that I was doing don't do that again, like take it real easy, let them know that it's an issue." (Doc. 39-1 at 39(149)). The doctor told her that "whatever [she] did to stress it and strain it, don't do it for a few days." (Doc. 39-1 at 83(323)).

She reported back to work the next day before beginning her shift at the regular time. However, from then on her ability to work was affected. She stated that

The two processes that really gave me trouble was putting the door on

8 (citing 39-1 at 38(143)). The citation does not support this assertion.

[20] This fact is offered by the plaintiff. It originally included the assertion that the plaintiff informed Henderson of "the injury." (Doc. 63 at 9) (citing 39-1 at 38(145)). However, the citation the plaintiff gives does not support this assertion. Accordingly, that portion of the fact was not included.

[21] The plaintiff proffers: "10. Although Alan Balmer denied in deposition that [p]laintiff suffered a workplace injury, Balmer's notes, which were composed while [p]laintiff was out on FMLA leave, indicate he knew [p]laintiff's injury was work related." (Doc. 63 at 9)(citing Doc. 64-3 generally). The failure to provide a pinpoint citation, or to explain in what way these notes "indicated" anything, prevents the court from including the fact. Similarly, the court will not include the plaintiff's proffered fact number 12 which states: "The notes also indicated that Josh Wade performed light duty responsibilities at another client company while he had restrictions." (Doc. 63 at 9)(citing 64-3 generally).

and installing DVD players because it involved me jumping in and out of the back seat and immediately squat to put on a door seal and that was strenuous car after car for two hours.

(Doc. 39-1 at 29(107)). She testified:

I was told by medical doctors that I need to take it easy for a little while, too much stress and strain while pregnant can cause complications. The nurses that seen me on site the next day told me that I was clear to go or whatever, that it says that I needed -- had limitations. I gave those limitation[s] to Isaac, he reviewed them with Ricky and that day I was still on doors, Ridgeline. I mean, it was all the same, nothing ever changed.

Q. So you say you had work restrictions the day you went back to work on July 22nd?

A. Yes.

Q. Where did you get those from?

A. From my actual ob/gyn. They were who saw me in labor and delivery because after a certain point in time you go to them instead of ER.

Q. What were those restrictions?

A. Easy on the bending, the lifting of the door, any of that. I need to not do that for a little while to make sure I didn't further complicate things.

Q. And that was due to the pregnancy?

A. Yes. Like the strain from the door caused me to stress my pregnancy and caused me to bleed.

Q. So what accommodations did you need in your job?

A. Just easy on the lifting part.

39

(Doc. 39-1 at 28(104-105)).

The plaintiff was not undergoing any kind of "treatment" for anything related to the spotting except normal prenatal care. (Doc. 39-1 at 56(217)). She had no further complications and nothing else happened during that time. She was given no medication and had only one follow up a week later to make sure the bleeding had stopped. (Doc. 39-1 at 56(217)).

The plaintiff states that the day she came back to work "I had to report to Casey or Robin, whichever one it was, and then go out on the line and that's when I said who is going to be paying the medical bill." (Doc. 39-1 at 30(111)). The following exchange took place in her deposition:

Tell me about your conversation with her about the Workers' Comp benefits, payment for medical bills.

A. When I received an on-the-job injury I left and they told me if I was to leave, because it was during the middle of the shift, that I would receive a point or two and that I told her about the medical staff there said that they cannot meet the demands of a pregnant woman, that I need to seek emergency attention, so I left to do so.

Q. When did the medical staff there say that?

A. The night of the injury.

Q. And what was her response?

A. The following day was her response on the workman's comp paying the bills or whatever, the medical bills.

Q. What did she say?

A. She said that she'll get back to me. That's all I heard.

(Doc. 39-1 at 15(50-51)). Neither HMA nor Elwood ever treated the July 21 incident as an on-the-job injury; a First Report of Injury was never completed.[22]

### 6.   *The Plaintiff Provides Work Restrictions*

The plaintiff stated that her request for light duty was "to keep [her] from further stressing [her] pregnancy," and to prevent "complications." (Doc. 39-1 at 44(167), 53(203), 28(104)). Balmer asked the plaintiff to bring in specific information about her request for "light duty."[23] The plaintiff stated that "it upset me that I had to get restrictions period. They knew the circumstances of being pregnant and what comes along with it starting with bathroom and then going to [sic] they asked for the light duty restrictions." (Doc. 39-1 at 44(167)). She thinks that Elwood should have just known what her light duty restrictions were, "[a]s any other pregnant woman

_____

[22] The plaintiff proffers: "Plaintiff's notes indicate that instead of providing her assistance with her injury, [d]efendants expressed skepticism that the injury was caused at work. (Pl.'s Ex. 2)." (Doc. 63 at 13). As plaintiff's notes will be stricken, this fact will not be included.

[23] The plaintiff understands that light duty can mean varying things for different individuals; for instance, it could include required sit-down breaks, rest breaks, and lifting restrictions of varying weight. (Doc. 39-1 at 44(166-167)). There may have been some confusion as to the applicability of the phrase "light duty" to the plaintiff's situation. Balmer stated in his deposition that, at Elwood, "light duty refers to a situation where there's a workplace injury." (Doc. 39-2 at 13(41)). At several points in his deposition, Balmer "objected" to the use of the phrase "light duty." Elwood and HMA did not consider this to be a workplace injury. Accordingly, although it is not clear from the record, this may have been another reason that Balmer wanted specifics.

working at Honda and getting certain limitations they follow the same guidelines." (Doc. 39-1 at 44(167)).

On August 11, 2011,[24] the plaintiff provided Elwood with a completed Certification of Health Care Provider for the purposes of Family and Medical Leave Act ("FMLA") administration. The Certification indicated that the plaintiff was "pregnant with a due date of 11/29/11," and that she could "work only light duty at this time." (Doc. 36-3 at 26). On or about August 16, 2011, the plaintiff's doctor wrote her restrictions limiting her to "no lifting over 25 pounds, no climbing in and out of cars and no bending." (Doc. 36-3 at 29).[25] When asked in her deposition if the restrictions were due to her pregnancy, she stated: "Yes. Like the strain from the door caused me to stress my pregnancy and caused me to bleed." (Doc. 39-1 at 28(105)). That same day, after receiving the plaintiff's letter from her physician, Webb sent Ricky Sanders an email which read:

Which of the following processes below would not require Randi to left

--------

[24] The record is unclear as to what, if anything, occurred between July 22 and August 11, 2011.

[25] The plaintiff proffers the following fact: "17. The restrictions [p]laintiff was placed under were not merely because she was pregnant but because of the injury she suffered." (Doc. 63 at 10 (citing 39-1 at 28(104)). The citation provided by the plaintiff does not support this fact. It will not be included. The plaintiff also proffers: "Defendants were aware before [p]laintiff's assignment ended that an injury caused [p]laintiff's pregnancy-related impairment." (Doc. 63 at 10 (citing generally to doc. 64-3 (Balmer's notes)). Again, the general reference to this evidence, without pinpoint citation or explanation, is insufficient. This fact will not be included.

25 pounds or more? OR to climb in and out of the vehicle? OR to bend?

In other words . . . Which ones could she perform with the named
restrictions?
Thanks!

Pilot:
Right Side Roof Rail
Assist Side Cowl Top
Left front door
RES & AT Labels

Ridgeline:
Left front door
Right Roof Mold

(Doc. 39-2 at 37). Again, that same day, Sanders responded: "Maybe AT Label. But

she would have to bend over to install some of the labels. So, really none." (Doc. 39-2

at 37).

Henderson and Sanders both stated in their affidavits that they are familiar with

the following processes performed within the plaintiff's zone: Left Front Door, Right

Roof Rail, Assist Side Cowl Top, Right Roof Mold, RES, and AT Label. (Doc. 62-3

at 4; 62-4 at 5). They both stated that "[a]ll of these processes require the associate

performing them to bend. Most of these processes require the associate to bend, lift,

and/or climb in or out of vehicles." (Doc. 62-3 at 4-5; 62-4 at 5).

The plaintiff agreed that her "regular job duties as they were then in AF

required some amount of lifting 25 pounds and some amount of climbing in and out

of cars and bending." (Doc. 39-1 at 54(206)) (emphasis added). One of these processes, installing DVD players, required her to climb in and out of cars. (Doc. 39-1 at 53(205)). She agreed that this was a process she could <u>not</u> do. (Doc. 39-1 at 53(205)). When installing doors, she would have to lift weights up to and greater than 25 pounds. (Doc. 39-1 at 53(205)). She also testified that "[t]he bending had part of the same process. It was putting on the door seal in the same DVD process." (Doc. 39-1 at 53(205)). When asked to identify a job in her zone, which was not one of her regular jobs, but which she felt she could have done with her restrictions, the plaintiff identified putting vehicle identification numbers on vehicles. (Doc. 39-1 at 29(107)). The following exchange took place in the plaintiff's deposition:

> Q. So Robin and Casey would not allow you to work light duty even though they were aware you were suffering from an injury?

> A. All of them said that they couldn't find anything at Honda to place me on a lighter duty restriction, they couldn't meet those recommendations. So I asked if I could be placed somewhere else that was other than Honda and still be able to come back to Honda after my FMLA leave. I never got anything.

(Doc. 39-1 at 56(215)). In her deposition, she was clear that she did not know what HMA did to try to accommodate her restrictions. (Doc. 39-1 at 81(316)).

At the time of the events at issue in this action, Kimberly White was employed by HMA as an Associate Administrator of Associate Relations at the plant. (Doc. 62-

5 at 2). Her job included various human resources functions. (Doc. 62-5 at 2).  In her affidavit she stated:

> Elwood informed me that Ms. Abbott's Team Manager and Team Coordinator had reviewed Ms. Abbott's work restrictions and the production processes she was required to perform . . . and concluded that Ms. Abbott could not perform her assigned processes with her personal restrictions. Because Ms. Abbott was neither ADA-qualified nor permanently restricted due to an occupational injury, a restriction placement search outside of her assigned zone was not performed.

(Doc. 62-5 at 7-8).

On August 17, 2011, Balmer e-mailed the Oxford Elwood Branch to see if there were any available positions with other clients which would meet the plaintiff's personal medical restrictions. (Doc. 59-5 at 4). He then called the branch office and learned that there were no such assignments available. (Doc. 59-5 at 4). Balmer also sent an e-mail to White asking if there were any other positions at HMA where the plaintiff could work within her restrictions. White responded that HMA could not accommodate the plaintiff's specific personal medical restrictions. The plaintiff specifically inquired with Elwood about a job as a receptionist that she thought she could do with her restrictions, but Elwood told her that "it couldn't meet [her] restrictions either." (Doc. 39-1 at 43(164-165)).

Because the plaintiff could not perform her processes at HMA, and because Elwood had no other positions available which could meet her personal medical

restrictions, she was approved to take FMLA leave based on her FMLA Certification. (Doc. 59-5 at 4). Elwood approved the plaintiff's request for FMLA leave associated with her pregnancy starting August 15, 2011, and she received twelve weeks of FMLA leave. The extent of her FMLA retaliation claim is that she was required to take her FMLA leave "too early," which meant she did not have leave available to cover her recovery time after childbirth.

### 7.   *Plaintiff Exhausts Her FMLA Leave*

On November 9, 2011, Balmer informed the plaintiff that she had exhausted her FMLA leave. (Doc. 39-1 at 55(210)).[26] The plaintiff requested an extension of FMLA unpaid leave beyond her 12 weeks which was not granted. (Doc. 39-1 at 34(129)). It was the plaintiff's understanding at that point that Elwood would allow her to return to work if she could do her regular job duties, but she could not because she was still pregnant. (Doc. 39-1 at 55(210)). The plaintiff told Balmer that she was "more than happy to work under the same guidelines that I had already asked about, the restrictions up until [the birth of her child]. So I was more than glad to work up until that date. . . . [w]ith my restrictions." (Doc. 39-1 at 55(211)). Balmer told her that she could not work at HMA with her restrictions, and Elwood then ended her

_____

[26] It is undisputed by the plaintiff that Balmer was the decisionmaker with regard to the ending of the plaintiff's HMA assignment when she could not return from FMLA leave.

assignment.

The plaintiff made clear to Balmer that she was scheduled for a C section approximately two weeks after her FMLA leave expired. She told Balmer that her recovery period would be over in February 2012, when her restrictions would be lifted. Balmer told the plaintiff that if she wanted to be considered for future assignments with Elwood, she would need to contact the Oxford branch office. Balmer further instructed the plaintiff that, if she wanted to return to work at HMA, she would need to provide information from her physician that her restrictions had changed.[27]

The plaintiff gave birth to her child on November 22, 2011. She was released to work full duty in February 2012. At that time, the plaintiff was on "inactive" status

---

[27] The plaintiff proffers that "Balmer informed [p]laintiff she would be terminated if she did not return to work without restriction." (Doc. 63 at 10 (citing doc. 39-1 at 55(210) (the plaintiff's deposition)). The citation does not support that proffered fact. In his deposition, Balmer stated:

> I explained that her 12 weeks of FMLA leave had expired, and inquired if – inquired if her personal medical restrictions had been lifted so that she could return on assignment. And she indicated that it had not. As a result, I notified her that her assignment at HMA had been ended and that if she wanted to be considered for future assignments with Elwood Staffing that she would need to produce -- well, that she would need to contact the Oxford branch office. And that specifically if she wanted to come back to assignment at HMA that she would need to provide information from her personal medical physician that her restrictions had changed.

(Doc. 39-2 at 18(60-61)).

with Elwood but would be eligible for assignment upon contacting Elwood to update her file. The plaintiff contacted the Oxford branch office in February 2012, and informed it that her restrictions had been lifted and that she was available to work. (Doc. 39-1 at 55(212), 57(219)). She called back a few weeks later to ask if there were any positions available for her and was told "they would have to get back with [her] on that." (Doc. 39-1 at 57(221)). In her affidavit, the plaintiff states that, in May 2013, she "contacted the Montgomery office of Elwood Staffing Services and requested to be placed back on active status." (Doc. 64-5 at 1). She states that she "received an email from Elwood on May 15, 2013 informing [her] that Elwood would contact [her] when 'an opening comes available that matches your skills and work experience.'" (Doc. 64-5 at 1-2). She states that "Elwood has not contacted me since receipt of the May 15 email." (Doc. 64-5 at 2).

The plaintiff has never contacted anyone at HMA regarding her restrictions being lifted, or her ability to work. (Doc. 39-1 at 82(318); doc. 62-5 at 8). It is undisputed that HMA played no role in any attempt by the plaintiff to be assigned to another Elwood client company.

In her deposition, the plaintiff stated that her condition "wasn't a disability, it was pregnant and on-the-job injury, I wasn't disabled. I was at all times physically able to work with requirements and restrictions." (Doc. 39-1 at 28(103)). She never

considered herself disabled when she was at HMA. (Doc. 39-1 at 28(103)).[28]

## 8.    *Male Employees Given Light Duty*

The plaintiff identified Josh Wade as a male associate who she believes was

provided a light duty assignment. (Doc. 39-1 at 18(64)).[29] Wade was an Elwood

_____

[28] The plaintiff disputes the statements in this paragraph saying:

> 12-16. Disputed. As set out at length in [p]laintiff's statement of facts, [p]laintiff
> was not provided light duty after she suffered a work injury, Elwood did not
> accommodate [p]laintiff because of her disability or pregnancy, did not treat the
> restrictions required because of [p]laintiff's pregnancy and the complications to
> her pregnancy because of a work injury in the same manner it handled the work
> restrictions of Josh Wade, a male worker, and [p]laintiff's condition constituted a
> disability under the expanded scope of the ADA in light of the 2008 Amendments.
> (Pl.'s Depo., pp. 49-51, 63, 69-71, 104-05, 107-08, 109-10, 125-26, 129, 142-43,
> 145, 164, 210-12, 219-21; Pl.'s Exhibit 1; Pl.'s Ex. 2; Pl's Ex. 3; Pl.'s Ex. 4;
> Balmer Depo., p. 60, 62).

(Doc. 63 at 3). This general denial of several facts, with the inclusion of argument, is inadequate
to dispute the defendants' proffered facts. The court's summary judgment scheduling order
clearly states:

> The non-moving party's response to the moving party's claimed undisputed facts
> shall be in separately numbered paragraphs that coincide with those of the moving
> party's claimed undisputed facts. Any statements of fact that are disputed by the
> non-moving party must be followed by a specific reference to those portions of
> the evidentiary record upon which the dispute is based. *All material facts set forth
> in the statement required of the moving party will be deemed to be admitted for
> summary judgment purposes unless controverted by the response of the party
> opposing summary judgment.*

(Doc. 5 at 17) (emphasis in original). The court will not search through the record in an attempt
to determine which evidence disputes what fact.

[29] She also discusses Carlos Fields and Gary Pitts at this section of her deposition. She
does not reference these individuals in her argument, so the court will not discuss them here. The
plaintiff offered the following fact, which is not supported by the citation given and will not be
included: "27. Plaintiff complained to the EEOC before her employment ended that she was
being forced to use her FMLA leave though she had requested light duty. (Pl.'s Depo., pp.

employee who broke his foot while working at HMA. It is undisputed that this was a workers' compensation covered on-the-job injury at HMA. Elwood provided him a light duty assignment, placing chips in a box, at another client company "that had nothing to with Honda." (Doc. 39-1 at 44(168)).

### 9.    *No Complaints of Discrimination*

It is undisputed that the plaintiff understood that, if she experienced unlawful treatment, she should report her concerns to an OSS, her HMA Team Coordinator, her HMA Team Manager, or HMA's Human Resources personnel. Still, the plaintiff never made a complaint of pregnancy, sex, race, or disability discrimination or harassment under HMA's Mutual Respect Policy. (Doc. 62-3 at 8; 62-4 at 9; 62-5 at 10). The following exchange took place in the plaintiff's deposition:

> Q. Did you ever complain to anyone at Elwood or Honda that you felt you were being treated differently because of your sex or your gender?
>
> A. Like are you talking about superior or are you just talking about in general?

---

125-26)." (Doc. 63 at 12). The following facts, proffered by the plaintiff, have been omitted as the evidence to which they cite will be stricken:

> 37. Plaintiff has identified Jessica (Last Name Unknown) (African American) as a comparator. (Pl.'s Depo., p. 74).

> 38. Jessica LNU was a pregnant employee who was placed on easier processes because of her pregnancy (Id., pp. 89-91).

(Doc. 63 at 13).

Q. Someone who -- not a co-worker for now, so someone who you reported to or who worked over you.

A. I think it was during the conversation of getting written up where I told her I feel like I'm getting closed in on.

Q. So you're talking about the conversation with Casey [Green]?

A. Yes.

Q. And you said like you were getting closed in on?

A. Yes, ma'am.

Q. Did you say it's because I'm a female or it's because of my gender or anything like that?

A. I just said I feel like I was getting closed in on because of all this. I didn't name specifics.

Q. Any other time you complained to anyone that you felt like you were being treated unfairly because you were a female?

A. To anyone?

Q. Not a co-worker, to someone above you.

A. No.

Q. Did you complain to anyone other than a co-worker, someone who was at your same level that you felt like you were being treated unfairly because of your gender?

A. I spoke about it to co-workers, yes.

Q. They were all in the same position as you?

A. Yes.

Q. That was the only thing other than the discussion with Casey?

A. Yes.

Q. And with Casey you weren't specific, you just felt like you were being closed in on?

A. Yes.

Q. Did you ever complain to anyone other than a co-worker, so someone above you or anybody, that you felt you were being treated unfairly because of your race?

A. Like I said, the conversation was just in general, everything. I didn't name specifics.

Q. So that conversation with Casey and nothing else?

A. Nothing.

Q. And that was when you signed that final warning?

A. Yes, ma'am.

Q. Tell me every time that you complained to anyone other than a co-worker that you felt like you were being treated unfairly because of disability.

A. Not that I can recall.

Q. And every time that you complained to anyone other than a co-worker was you felt like you were being treated unfairly because of your pregnancy?

A. Nothing but that conversation.

52

(Doc. 39-1 at 68(263)-69(266)). On August 7, 2011, the plaintiff sent an e-mail to OSS Webb stating simply that she was "filling [sic] a report to EEOC about pregnancy discrimination;"she provided no other substantive information in this e-mail. That e-mail stated: "I know you have no idea what is going on."

At no time did Elwood attempt to place the plaintiff on assignment at HMA following her release to full duty. Numerous Elwood and HMA associates have taken FMLA leave related to pregnancy and returned to work at HMA.

### 10.  *Continued Refusal To Hire*

The plaintiff testified that no one ever told her that she was fired or could not come back. (Doc. 39-1 at 34(128)). In May 2013, after Balmer claimed in his deposition that the plaintiff was on inactive status, she again attempted to gain reinstatement but has received no offer to return to work. Elwood receives weekly orders from HMA for a set number of associates–sometimes for as many as 80 per week. (Doc. 39-2 at 8(21)-9(23)). Elwood sent the plaintiff an email on May 15, 2013, informing her that it would contact her when "an opening comes available that matches [her] skills and work experience." (Doc. 64-5 at 1). Since that email, Elwood has not contacted the plaintiff. (Doc. 64-5 at 1).  When asked in his deposition whether he received such requests in February and March 2012, Balmer stated: "I don't have a specific memory of it, I mean, typically we received communication each

week regarding whether the orders are zero or any number above zero, so most likely

yes, but I don't have a specific recollection of that." (Doc. 39-2 at 19(62)).[30]

The plaintiff testified: "I claim that I was fired for asking for my medical bills

to be paid and I was harassed for restrictions. Like they wanted to see restrictions, I

got restrictions. They wanted detailed restrictions, I got them detailed restrictions and

next thing I know I wasn't working anymore." (Doc. 39-1 at 29(109)).

**C.    Analysis**

**1.    *Count One–Title VII Disparate Treatment (Non-Termination)***

**a.    The Allegations in Count One Demonstrate that the Third Amended Complaint Is still a "Shotgun" Pleading**

On October 10, 2013, the court noted that the <u>Second</u> Amended Complaint was

"the quintessential 'shotgun' pleading," and stated:

> Neither the Second Amended Complaint, nor the plaintiff's reply brief to
> the motion for summary judgment, explains what conduct goes with
> which counts. Each count merely incorporates by reference the facts as
> stated in the complaint and asks that the court "declare the rights and
> duties of the parties consistent with the relief sought by [p]laintiff."

(Doc. 52 at 4). The court then ordered the plaintiff to file a Third Amended Complaint

---

[30] The plaintiff proffers the following fact: "32. Elwood contends that Balmer did not have any knowledge that [p]laintiff suffered a work injury, but as discussed above, as demonstrated in the notes he composed, he was aware. (Pl.'s Ex. 3)." (Doc. 63 at 12). The fact is disputed by both defendants. As noted above, this general citation to the Balmer Notes is insufficient. Because there are no specifics as to what portion of those notes show this alleged knowledge, the court will not include this fact.

54

"which clearly (and separately) sets out each count, specifies the facts which apply to each count, and clearly states as to which defendant each count applies." (Doc. 52 at 5). Unfortunately, the Third Amended Complaint continues to miss the mark.

### (1)     Despite Its Confusing Title, Count One Is <u>Only</u> a Title VII Claim

The problems with Count One begin at the beginning–the title of the claim. The plaintiff's first count[31] is entitled: "Failure to Accommodate on the Basis of Pregnancy/Sex-Pregnancy Discrimination Act/Title VII." (Doc. 53 at 2).  The use of the phrase "failure to accommodate" implies a claim under the Americans With Disabilities Act (the "ADA").[32] However, because the plaintiff specifically makes an ADA claim in her third and fourth counts, and because the ADA is not specifically mentioned in her first count, the court assumes that an ADA claim is not present in her first cause of action. Title VII and the Pregnancy Discrimination Act ("PDA") <u>are</u> specifically mentioned in Count One.[33] Accordingly, the court will treat this count as falling under <u>only</u> those laws.

---

[31] Actually, the plaintiff does not set out "counts." Instead, she sets out her "first cause of action," "second cause of action," etc. However, the court will use the term "count."

[32] The ADA, among other things, prohibits discrimination by "not making <u>reasonable accommodations</u> to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C.A. § 12112(b)(5)(A) (emphasis added).

[33] As is shown below, the Pregnancy Discrimination Act merely amended Title VII. Accordingly, Count One is really only a Title VII claim.

**(2)     The Third Amended Complaint Falls To Adhere to This Court's Order To Separate the Claims and Defendants**

Next, despite this court's order to "clearly (and separately) set[] out each count, specif[y] the facts which apply to each count, and clearly state[] as to which defendant each count applies" (doc. 52 at 5), the Third Amended Complaint continues to lump together, in the same count, both defendants, and multiple allegations of wrongdoing.

Count One sets out three different acts of wrongdoing. The first alleged act is that, after the plaintiff "experienced bleeding from her vagina . . . [she] requested an accommodation in the form of light duty [but] . . . [i]nstead of putting her on light duty, [p]laintiff's supervisors returned [p]laintiff to regular duty putting on doors." (Doc. 53 at 3). This language does not explain which defendant is responsible for this alleged wrong and why. The answer cannot be discerned by merely looking at who employed the plaintiff's supervisors, since she was supervised by individuals employed by <u>both</u> defendants.[34] Further, the absence of dates and other specifics makes it impossible to discern which "refusals to accommodate" the plaintiff is referencing. The plaintiff might be referring to HMA's refusal to accommodate her

---

[34] The plaintiff's supervisors included Team Coordinator Isaac Henderson, and Team Manager Ricky Sanders, both employed by HMA. Elwood employed Alan Balmer as a project plant manager at HMA, and several persons in the position of "On-Site Supervisor" ("OSS"), including Casey Green, Robin Webb, B.B. Campbell, and Amanda Souza.

after she requested to "take it easy" on June 22, 2011, the day after her incident. Or she might be referring to HMA's <u>continued</u> refusal to provide her with light duty after she presented more specific restrictions from her doctor. Or, she could be referring to Elwood's part in each such refusal, although that seems unlikely since it is undisputed that Elwood plays no role in the process-rotation schedule or in the assignment of processes.

In addition, Count One adds an allegation that the plaintiff "was qualified for placement through Elwood at other positions that would have accommodated her restrictions but received no accommodation." (Doc. 53 at 3). This allegation seems to be directed only at <u>Elwood</u>, despite the fact that this count as a whole is supposedly is aimed at <u>both</u> defendants. Further, the allegation contains no facts or other specifics through which the court could discern for what positions the plaintiff was supposedly qualified with her restrictions, if she applied for those positions, when she applied, etc.

Finally, Count One lumps in that the "[d]efendants also denied [p]laintiff's reasonable request for extended unpaid leave until she had recovered form her pregnancy." (Doc. 53 at 3). The allegation includes no facts from which the court could discern which defendant was responsible for granting such leave, which defendant was asked it, when it was requested, and when it was denied. However, it

is undisputed that only Elwood had anything to do with the plaintiff's FMLA leave.[35]

Because the plaintiff has repeatedly failed to comply with this court's orders, dismissal of Count One is appropriate. FED. R. CIV. P. 41(b); *Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir. 1985). The court has, the best it can, reviewed the allegations of each count along with the arguments in the briefs, and determines that summary judgment is also appropriate on the merits of Count One. Accordingly, even if the plaintiff had requested leave to amend yet again, which she has not, amending the complaint would be futile.[36] Further, the plaintiff has already had two opportunities to amend. Accordingly, the court will not order repleader again.

### b.    The *McDonnell Douglas* Framework

Title VII provides:

[i]t shall be an unlawful employment practice for an employer . . . to fail

---

[35] In addition to being of a shotgun nature, these summary and conclusory allegations do not plausibly establish a claim consistent with the requirements of *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1939, 173 L. Ed. 2d 868 (2009). However, the defendants did not move to dismiss the claim, despite these problems.

[36] One might think that the court could simply review the parties', and in particular the plaintiff's, submissions on the motion for summary judgment to discern which facts support which allegations, since, under *McDonnell Douglas*, the plaintiff has the initial burden to prove her *prima facie* case as to her claims of discrimination. *See, Kidd v. Mando Am. Corp.*, No. 12-12090, 2013 WL 5382138 at *3 (11th Cir. Sept. 27, 2013). But taking that approach would require the court to "sift out the irrelevancies, a task that can be quite onerous." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002). Regardless, in responding to the motions for summary judgment, the plaintiff fails in that respect as well, which will be another basis for granting summary judgment.

> or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C.A. § 2000e-2(a)(1). The Pregnancy Discrimination Act expanded the definition of the Title VII phrases "because of sex" and "on the basis of sex" to include "because of or on the basis of pregnancy, childbirth or related medical conditions." *See, Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 684, 103 S. Ct. 2622, 2631, 77 L. Ed. 2d 89 (1983) ("The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.") Accordingly, at its core, this count actually alleges only that the plaintiff was discriminated against because of her sex.

Where, as in this case, the plaintiff's case is based upon circumstantial (as opposed to direct) evidence, the court employs the familiar three part framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework,

> [t]he Title VII plaintiff bears "the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990). Thus, under the first part of *McDonnell Douglas,* the plaintiff must establish by a preponderance of the evidence a prima facie case of discrimination. If she does, the burden of production shifts to the employer, which requires the

> employer to introduce evidence of "some legitimate, nondiscriminatory reason" for its employment decision. *McDonnell Douglas,* 411 U.S. at 802. If the employer satisfies its burden, "the presumption raised by the prima facie case is rebutted." *Collado v. United Parcel Serv. Co.,* 419 F.3d 1143, 1151 (11th Cir.2005) (internal quotation marks omitted). Because the burden of persuasion remains with the employee, she must then show that the seemingly legitimate reason the employer gave was pretextual—i.e., the "proffered reason was not the true reason for the employment decision." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (internal quotation marks omitted); *see also Collado,* 419 F.3d at 1150 (noting that once the employer satisfies its burden "the presumption of discrimination that arose when the plaintiff made [her] prima facie showing 'drops from the case,' and 'the case is placed back into the traditional framework—in other words, the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against [her] on the basis of a protected personal characteristic' " (internal citations omitted)).

*Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013). Further, in disparate treatment cases, such as this one, the plaintiff must prove discriminatory intent. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273 (11th Cir. 2000). "In order to show discriminatory intent, a plaintiff must demonstrate that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects on an identifiable group." *Joe's Stone Crab, Inc.*, 220 F.3d at 1273.

### c.    The Plaintiff Has Not Established a Prima Facie Case

A prima facie case of pregnancy discrimination requires the plaintiff to show

that: (1) she is a member of a group protected by Title VII; (2) she was qualified for the position or benefit sought; (3) she suffered an adverse effect on her employment; and (4) she suffered from a differential application of work or disciplinary rules. *Sampath v. Immucor, Inc.*, 271 F. App'x 955, 961 (11th Cir. 2008) (*citing Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999)). In her brief, the plaintiff not only fails to set out and argue these elements, she does not even mention the *McDonnell Douglas* framework. Because the plaintiff has neither acknowledged nor attempted to satisfy her burden, her Title VII disparate treatment claims fail.[37]

### (1)    Refusal To Give the Plaintiff Light Duty at HMA

#### (a)    HMA

Despite the shotgun nature of this count, it is clear that the plaintiff alleges, albeit vaguely and conclusorily, that the defendant, or defendants, somehow and someway, refused light duty to the plaintiff after her spotting incident on July 21, 2011. However, even under the Pregnancy Discrimination Act, the plaintiff "was not entitled to a modified duty assignment solely because she was pregnant." *McQueen*

---

[37] The most logical and clear way to address these issues would have been to start with the cause of action in Count One, and the allegations therein, and examine whether the plaintiff has established her prima facie case. However, in especially confusing argument, the plaintiff lumps together her pregnancy, sex, and disability claims, against both defendants and tries to argue them all at once. Her brief focuses only on responding to some of the defendant's arguments. Claims that she did not defend are abandoned. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

*v. AirTran Airways, Inc.*, 3:04-CV-00180-RS-EMT, 2005 WL 3591100 at *5 (N.D.

Fla. Dec. 30, 2005) (Smoak, J.). "[A]n employer violates the [Pregnancy

Discrimination Act] when it denies a pregnant employee a benefit generally available

to temporarily disabled workers holding similar job positions." *Spivey v. Beverly*

*Enterprises, Inc.*, 196 F.3d 1309, 1313 (11th Cir. 1999).

In a case with similar facts to the instant case, the court in *Spivey* explained:

> There is no dispute that Appellant was no longer qualified to work
> as a nurse's assistant. The lifting restriction imposed on Appellant clearly
> prevented her from performing the responsibilities required of this
> position. Appellant argues, however, that she should have been given the
> accommodation of modified duty because she was as capable of
> performing the duties required of a modified duty assignment as non-
> pregnant employees who were injured on the job. Appellee, however,
> was under no obligation to extend this accommodation to pregnant
> employees. The [Pregnancy Discrimination Act] does not require that
> employers give preferential treatment to pregnant employees. *See, e.g.,*
> *Lang v. Star Herald,* 107 F.3d 1308, 1312 (8th Cir.1997); *Garcia v.*
> *Woman's Hosp. of Texas,* 97 F.3d 810, 813 (5th Cir.1996); *Troupe v.*
> *May Department Stores Co.,* 20 F.3d 734, 738 (7th Cir.1994). Appellee
> was therefore free to provide an accommodation to employees injured on
> the job without extending this accommodation to pregnant employees.
>
> Appellant also has failed to establish that she suffered from a
> differential application of work rules. In *Byrd v. Lakeshore Hospital,* 30
> F.3d 1380 (11th Cir.1994), this Court held that an employer violates the
> [Pregnancy Discrimination Act] when it denies a pregnant employee a
> benefit generally available to temporarily disabled workers holding
> similar job positions. *See id.* at 1383-84. In this case, the benefit
> Appellant seeks is not generally available to temporarily disabled
> workers. To the contrary, Appellee offers modified duty only to a clearly
> identified sub-group of workers-those workers who are injured on the

job.

> The correct comparison is between Appellant and other employees who suffer non-occupational disabilities, not between Appellant and employees who are injured on the job. Under the [Pregnancy Discrimination Act], the employer must ignore an employee's pregnancy and treat her "as well as it would have if she were not pregnant." *Piraino v. International Orientation Resources, Inc.,* 84 F.3d 270, 274 (7th Cir.1996). Ignoring Appellant's pregnancy would still have left Appellee with an employee who suffered from a non-occupational injury. Appellee, as per its policy, was therefore entitled to deny Appellant a modified duty assignment as long as it denied modified duty assignments to all employees who were not injured on the job.

*Spivey*, 196 F.3d at 1312-13.[38]

Just like in *Spivey*, it is clear in this case that the plaintiff could not perform <u>all</u>

---

[38] The court rejects the plaintiff's citation to the unpublished Sixth Circuit opinion of *Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 487 (6th Cir. 2013), which follows the Sixth Circuit rule that "the [Pregnancy Discrimination Act] requires only that the employee be similar in his or her ability or inability to work." *Latowski*, 549 F. App'x at 487 n. 3. In *Latowski*, the Sixth Circuit held that "[a]lthough [proffered comparators] differed from [the pregnant plaintiff] because their medical conditions were work-related, they were similarly situated in their ability to work because they were placed under lifting restrictions of up to fifty pounds." *Id.* at 483. The Sixth Circuit, in a footnote, noted

> Under the ordinary Title VII analysis, employees who were restricted because of work-related injuries would be inappropriate comparators because they are not similarly situated in all respects. However, the *Ensley–Gaines* court recognized that the [Pregnancy Discrimination Act] altered the Title VII analysis for pregnancy discrimination claims: "While Title VII generally requires that a plaintiff demonstrate that the employee who received more favorable treatment be similarly situated in all respects, the [Pregnancy Discrimination Act] requires only that the employee be similar in his or her ability or inability to work."

*Id.* at 487, n. 3 (quoting *Ensley–Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir.1996)). The *Ensley-Gaines* decision, and *Latowski*, are inconsistent with existing, and binding, Eleventh Circuit precedent in *Spivey*. Further, *Ensley-Gaines,* a 1996 opinion, was available to the Eleventh Circuit when it issued *Spivey* in 1999.

of the duties of her job as a "process associate" or MST. HMA only provides light duty assignments to employees who have suffered on-the-job injuries. It was therefore free to deny light duty to the plaintiff as long as it did the same to other employees who were not injured on the job.[39] The plaintiff provided no admissible evidence of an employee with similar restrictions, who was not injured on the job, and who was provided, by HMA, the accommodation she seeks.

The plaintiff argues that this <u>was</u> an on-the-job injury, and cites the court to the example of Josh Wade, who was given a light duty assignment after such an injury. (Doc. 63 at 14-15). However, just because the plaintiff first noticed spotting <u>while working</u>, does not mean that she was "injured" at work, or that the work caused the injury.[40] The plaintiff has submitted no admissible evidence showing that this was an on-the-job injury. It was not treated as an on-the-job injury by her employers, and the

---

[39] While the court analyzes this issue in terms of whether the plaintiff was treated differently from other, similarly situated employees, it notes that, in the Eleventh Circuit, the denial of an accommodation for pregnancy is also not an "adverse employment action." *See, Jeudy v. Attorney Gen., Dep't of Justice*, 482 F. App'x 517, 521 (11th Cir. 2012) ("[W]e find no error in the district court's conclusion that the denial of Jeudy's request for an accommodation could not be considered a materially adverse employment action, which required Jeudy to establish a *serious and material* change in the terms, conditions, or privileges of employment,' as viewed by a reasonable person in the circumstances.") (quoting *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1240 (11th Cir.2001)). This issue too was raised by HMA. (Doc. 61 at 19-20; doc. 68 at 14). The plaintiff did not respond to this argument.

[40] The plaintiff states that "Elwood appears to concede that [p]laintiff in fact suffered an injury on the job." (Doc. 63 at 14) (citing doc. 58 at 31). The citation does not support the plaintiff's assertion.

plaintiff received no workers' compensation benefits as a result of the incident. Further, <u>Elwood</u>, not HMA, provided Wade the light duty assignment at another company which had nothing to do with HMA. Accordingly, even if this was an on-the-job injury, Wade is not a valid comparator to establish that <u>HMA</u> treated him differently than the plaintiff.[41]

The plaintiff's deposition testimony also clearly shows that her restrictions were only because of her pregnancy and not the result of an on-the-job injury. When asked in her deposition whether "the light duty restrictions [she] sought were simply because [she was] pregnant," she answered: "Yes, to keep me from further stressing my pregnancy." (Doc. 39-1 at 44(167)). Also, she stated that while she was still pregnant, she could not return to work. (Doc. 39-1 at 55(210)). Most tellingly, she testified that she was upset when Balmer asked her for more specific restrictions because

---

[41] The plaintiff does not address this argument. The court also notes that, even if the plaintiff <u>was</u> injured on the job, Wade is still not a valid comparator because there is no evidence that he was otherwise similarly situated to her. "The plaintiff and the employee she identifies as a comparator must be similarly situated 'in all relevant respects.' The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). As to what processes her co-employees were certified, or "signed off on," to perform the plaintiff stated: "Like we all signed off on a list, but unless the same person did the same thing you wouldn't know it because you wouldn't be seeing it assigned." (Doc. 39-1 at 76(294)). The lack of evidence as to the processes on which Wade was certified makes it impossible to say that he was similarly situated to the plaintiff. Further, there is no evidence that Wade had similar work restrictions as the plaintiff. Although this argument was raised by the defendants, the plaintiff does not address it, writing only that "[d]efendants contend that [p]laintiff is not similarly situated to Wade because she did not suffer an injury on the job." (Doc. 63 at 14).

[t]hey knew the circumstances of being pregnant and what comes along with it starting with bathroom and then going to they asked for the light duty restrictions.

Q. So you think they should have just known what your light duty restrictions were?

A. Yes, <u>as any other pregnant woman working at Honda and getting certain limitations they follow the same guidelines</u>.

(Doc. 39-1 at 44(167)) (emphasis added). It is clear that the plaintiff merely wanted the same restrictions "as any other pregnant woman working at Honda," not special restrictions because of an on-the-job injury.

There is simply no evidence that HMA treated the plaintiff differently than any other non-pregnant employee with similar restrictions, who was not injured on the job. Any claim under the PDA and Title VII, again HMA, based upon the failure to provide the plaintiff with "light duty" fails on the merits.

### (b)   Elwood

The plaintiff's brief in response to the motion for summary judgment focuses on Elwood's failure to find the plaintiff another assignment that met her restrictions, not the failure to give her light duty <u>at HMA</u>. Regardless, it is undisputed that Elwood has no control over the processes which were assigned to the plaintiff at HMA. The plaintiff has made no argument that Elwood otherwise should be held responsible for not giving the plaintiff light duty <u>at HMA</u>. Summary judgment therefore is appropriate

for Elwood to the extent that the plaintiff alleges that it is responsible for the failure to assign the plaintiff to light duty at HMA.[42]

> **(2)     The Refusal by Elwood To Find Other Assignments, at Businesses other than HMA, that the Plaintiff Could Do with her Restrictions**

> **(a)     HMA**

The plain wording of the complaint indicates that this claim is brought only against Elwood. Further, it is undisputed that HMA played no role in any attempt by the plaintiff to be assigned to another Elwood client company. Summary judgment is due on Count One, in favor of HMA, to the extent that count is based on these allegations.

> **(b)     Elwood**

Elwood provides light duty in instances where its employees suffer an on-the-job injury, of which it is made aware, who need restrictions in order to continue working. Additionally, Elwood engages in an interactive process to determine whether it can reasonably accommodate qualified individuals with disabilities as defined by the Americans With Disabilities Act. With regard to non-work-related medical conditions, including pregnancy, Elwood tries to work with its client locations to see if the

---

[42] The shotgun nature of the Third Amended Complaint makes such guesswork necessary in order to cover all of the plaintiff's legal bases.

associate's personal restrictions can be met, but it does not have a formal "light duty" program for personal medical restrictions. Elwood handles requests for personal medical restrictions related to pregnancy in the same manner it handles requests for personal medical restrictions related to other non-work-related conditions.

On August 17, 2011, Balmer e-mailed the Oxford Elwood Branch to see if there were any available positions with other clients which would meet the plaintiff's personal medical restrictions. (Doc. 59-5 at 4). He then called the branch office and learned that there were no such assignments available. (Doc. 59-5 at 4). Balmer also sent an e-mail to White asking if there were any other positions at HMA where the plaintiff could work within her restrictions. White responded that HMA could not accommodate the plaintiff's specific personal medical restrictions.[43] Because the plaintiff could not perform her processes at HMA, and because Elwood had no other positions available which could meet her personal medical restrictions, she was approved to take FMLA leave based on her FMLA Certification. (Doc. 59-5 at 4).

_____

[43] The plaintiff implies that there were jobs she could do at HMA. The plaintiff argues that she "was able to continue to perform some of the processes that were within her restrictions. Honda informed Elwood that [p]laintiff could potentially perform the AT label function." (Doc. 63 at 16). In fact, when the plaintiff received her restrictions, OSS Webb asked Sanders if there was any process she could perform to which Sanders replied: "Maybe AT Label. But she would have to bend over to install some of the labels. So, really none." (Doc. 39-2 at 37). Even if she could perform some of the processes, it is undisputed that process associates are required to rotate through several different processes throughout their shift, and there is no evidence that being able to do some, but not all, of those processes was something that was feasible.

The plaintiff cites only <u>one</u> other job which she claims Elwood had, but did not give her. She argues that she specifically inquired with Elwood about a job as a receptionist that she thought she could do with her restrictions. (Doc. 63 at 16). Elwood informed her that "it couldn't meet [her] restrictions either." (Doc. 39-1 at 43(164-165)). The plaintiff cites no evidence as to where this job was located, or what the requirements of this job were. She has not shown that she could have performed the duties of this job with her restrictions. Regardless, even if she <u>could</u> perform the requirements of the receptionist job, she has not shown that her pregnancy was the reason she was denied the job. Further, she has not shown that other, similarly situated non-pregnant individuals were accommodated by Elwood while she was not.[44]

Summary judgment is appropriate in favor of Elwood as to Count One, to the extent that it is based upon these allegations.

### (3)   Denial of Extended FMLA Leave

#### (a)   HMA

The plaintiff states that "[d]efendants also denied [p]laintiff's reasonable request for extended unpaid leave until she had recovered form her pregnancy." (Doc. 53 at

---

[44] Elwood also argues that the plaintiff has not shown that any alleged conduct by it amounted to an adverse employment action. (Doc. 58 at 22-23). The plaintiff does not respond to this argument. As noted above, the failure to show this required element also requires the court to grant summary judgment in favor of Elwood.

3). It is undisputed that HMA played no role in the administration of FMLA leave to Elwood associates. Summary judgment in favor of HMA is appropriate on Count One to the extent that it is based on these allegations.

### (b)    Elwood

The evidence is undisputed that, after Balmer tried to find positions which met the plaintiff's restrictions and found none, he approved the plaintiff to take FLMA leave. The plaintiff's brief does not address the claim that Elwood failed to <u>extend</u> the leave.[45] Accordingly, the court treats that claim as having been abandoned. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). Further, even if the claim was not abandoned, the plaintiff cites no evidence that this was an adverse employment action, or that any similarly situated non-pregnant employee of Elwood was treated more favorably.

Summary judgment in favor of Elwood is appropriate on Count One to the extent that it is based on these allegations.

---

[45] The plaintiff's brief states that requiring the plaintiff to take FMLA leave early instead of giving her light duty was discriminatory. (Doc. 63 at 17). As noted above, the complaint makes no such claim, at least not as part of her Title VII claim, and the plaintiff cannot amend her complaint via her brief in opposition to the defendant's motion for summary judgment. *Miccosukee Tribe of Indians of Florida v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment.").

### d.    No Showing of Pretext

Even assuming that the plaintiff has established a prima facie case of discrimination, HMA states that it did not give the plaintiff light duty because it never gives employees light duty when they are not injured on the job. Elwood argues that it did not place the plaintiff in any other assignments because none were available.

> If the employer satisfies its burden by articulating one or more reasons [for the challenged conduct], then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination. If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with that reason is not sufficient.

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087-88 (11th Cir. 2004) (citations omitted).

"[A] reason cannot be proved to be "a pretext *for discrimination*" unless it is shown *both* that the reason was false, *and* that discrimination was the real reason. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407 (1993).

The plaintiff makes no argument, much less a showing, that these reasons were a mere pretext for discrimination.[46] For that reason as well, summary judgment is

---

[46] As far as the court can tell, the word "pretext" does not appear in the plaintiff's brief, and, as noted previously, the plaintiff does not discuss the *McDonnell Douglas* framework. The court has not endeavored to determine whether it might somehow construe the brief as having somehow made a pretext argument as "'[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.

appropriate to the extent Count One is based on the failure to give the plaintiff light duty and/or assign her to other positions.

2.     ***Count Two–Title VII Disparate Treatment (Termination)[47]***

This count alleges that the plaintiff was terminated after her FMLA leave expired. She contends that Elwood forced her to take her FMLA leave early, so that it would be exhausted before her child was born. (Doc. 63 at 17). Then, the argument goes, when the plaintiff did not return to work, it could, and did, terminate her. However, the count also alleges that the defendants refused to accommodate her with light duty after her leave expired. The count is brought against both defendants.

Like Count One, Count Two is "shotgun" in nature as it lumps both defendants together, and appears to allege multiple acts of wrongdoing without specifying each defendant's culpability separately. It is due to be dismissed as not in compliance with this court's order of October 10, 2013 (doc. 52). FED. R. CIV. P. 41(b). Further, the plaintiff fails to set out and argue the elements of her claim under the *McDonnell Douglas* framework. Because the plaintiff has neither acknowledged nor attempted to satisfy her burden, her Title VII claims fail for that additional reason. For the reasons

Rather, the onus is upon the parties to formulate arguments.'" *McIntyre v. Eckerd Corp.*, 251 F. App'x 621, 626 (11th Cir. 2007) (*quoting Resolution Trust Corp.*, 43 F.3d at 599).

[47] Count Two suffers from the same poor nomenclature as Count One. For the same reasons as it did so with Count One, the court treats this count as sounding only in Title VII sex discrimination.

shown below, the count is also due to be dismissed on its merits.

### a.    Light Duty

These allegations were addressed in the previous section. Both defendants are due summary judgment on Count Two to the extent that it is based on these allegations.

### b.    Termination

It is undisputed that HMA had nothing to do with the plaintiff's FMLA leave. As to HMA, summary judgment is appropriate on Count Two to the extent that it is based on these allegations.

In her brief in opposition to the motion for summary judgment, the plaintiff discusses termination in the context of Title VII only in passing, in one paragraph. (Doc. 63 at 17) ("I believe it is the intention of Elwood . . . to force me to exhaust my FMLA leave before the child is born, and then, when I am out for more than twelve weeks, to terminate me."). As with Count One, the plaintiff makes no attempt to set out, or prove, the prima facie elements of her termination claim. She therefore has not satisfied her initial burden and summary judgment is appropriate. Even if she had, there is no evidence that the plaintiff has in fact been "terminated." Indeed, the evidence establishes that she is on "inactive" status. Even assuming that the failure to reassign the plaintiff is somehow a *de facto* termination, there is no evidence of

similarly situated employees, who were not pregnant, but were treated more favorably than she.[48] Finally, there is no evidence of any jobs that were available that she could have performed with or without restrictions.

Finally, as noted above, Elwood argues that it did not place the plaintiff in any other assignments because none were available. The plaintiff has not argued or shown that this reason was a mere pretext for discrimination. Summary judgment is appropriate as to Elwood on Count Two to the extent that it is based on these allegations.

### 3. *Count Three–the Americans With Disabilities Act (Failure To Accommodate); Count Four–the Americans With Disabilities Act (Unlawful Termination on the Basis of Disability)*

In Counts Three and Four the plaintiff shifts from referring to herself as injured on the job, to having a "disability" under the Americans With Disabilities Act (the "ADA"). Count Three alleges that the plaintiff was not given a reasonable accommodation of light duty; Count Four alleges that the plaintiff was terminated after her FMLA leave expired while Josh Wade was allowed to remain.

Again, Counts Three and Four are "shotgun" in nature as they lump both defendants together without specifying each defendant's culpability separately. They are due to be dismissed as not in compliance with this court's order of October 10,

---

[48] As noted in the previous section, Josh Wade is not a proper comparator.

2013 (doc. 52). FED. R. CIV. P. 41(b). Further, the plaintiff fails to set out and argue the elements of her claim under the *McDonnell Douglas* framework.[49] Because the plaintiff has neither acknowledged nor attempted to satisfy her burden, her ADA claims fail for that additional reason. For the reasons shown below, the counts are also due to be dismissed on their merits.

"To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Holly v. Clairson Indus., L.L.C.,* 492 F.3d 1247, 1255-56 (11th Cir. 2007). The defendants correctly argue that the plaintiff cannot show that she was "disabled" under the ADA. Among other things, the ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more ... major life activities," 42 U.S.C. § 12102(2)(A).[50] "Major life activities" include, but are not limited to:

> (i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating,

---

[49] The framework applies to ADA cases. *Holly v. Clairson Indus., L.L.C.,* 492 F.3d 1247, 1255-56 (11th Cir. 2007).

[50] The statute also defines disability was "a record of such an impairment," 42 U.S.C.A. § 12102(2)(B) or as "being regarded as having such an impairment," 42 U.S.C.A. § 12102(2)(C). The plaintiff does not specify under which subsection she falls. However, there is no evidence that she falls under these latter two. Further, because the plaintiff states that she "was disabled," the court has analyzed this claim under the first subsection.

interacting with others, and working; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system.

(2) In determining other examples of major life activities, the term "major" shall not be interpreted strictly to create a demanding standard for disability. ADAAA section 2(b)(4) (Findings and Purposes). Whether an activity is a "major life activity" is not determined by reference to whether it is of "central importance to daily life."

29 C.F.R. § 1630.2(i)(1)-(2). The ADA Amendments Act of 2008 ("ADAAA") was

intended to make it easier for plaintiffs to prove they are disabled under the ADA. 29

C.F.R. Part 1630, App. § 1630.2(g) (citing 154 Cong. Rec. 13,766 (2008) (Joint

Statement of Reps. Hoyer and Sensenbrenner on the origins of the ADA Restoration

Act of 2008, H.R. 3195) ("the primary purpose of the ADAAA is to make it easier for

people with disabilities to obtain protections under the ADA")). The ADA, as

amended by the ADAAA, provides that a disability "shall be construed in favor of

broad coverage of individuals under this chapter, to the maximum extent permitted by

the terms of this chapter." 42 U.S.C. § 12102(4)(A); 29 C.F.R. § 1630.1(c)(4). The

EEOC has further explained that the "substantially limits" requirement is to be

"construed broadly in favor of expansive coverage" and "is not meant to be a

demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). Additionally, the term " 'major [life activity]' shall not be interpreted strictly to create a demanding standard for disability." *Id.* § 1630.2(i)(2).

"Pregnancy, absent unusual circumstances, is not considered a disability under the ADA." *Mayorga v. Alorica, Inc.*, 12-21578-CIV, 2012 WL 3043021 at *5 (S.D. Fla. July 25, 2012).  However, under the ADA and the ADAAA, a pregnancy-related impairment may be considered a disability, <u>if it substantially limits a major life activity</u>. 29 C.F.R. pt. 1630, App. § 1630.2(h) (emphasis added). The plaintiff acknowledges in her brief that a pregnancy related impairment must substantially limit a major life activity. (Doc. 63 at 18). She then argues:

> In the present case, there is no dispute that [p]laintiff suffered a pregnancy-related impairment that was not typical of a healthy pregnancy. As discussed above, the record is clear that straining to put on vehicle doors caused [p]laintiff to bleed from her vagina. The restrictions [p]laintiff was placed under were not merely because she was pregnant but because of the injury she suffered: that she was not placed on restrictions until after she was injured demonstrates this. (Pl.'s Depo., p. 104). When asked if these restrictions were because of pregnancy, [p]laintiff made clear that they were because of "the strain from the door" causing [p]laintiff "to stress my pregnancy" and causing "me to bleed." (Id., p. 105).

(Doc. 63 at 18-19).

The plaintiff's argument misses the point. First, there is no evidence that the plaintiff's pregnancy was not "healthy," or that there was some complication or other

issue regarding her pregnancy. In support of her position that her condition is disabling, the plaintiff cites *Mayorga v. Alorica, Inc.*, 2012 WL 3043021. In that case, the plaintiff, Mayorga, had suffered complications during her previous pregnancies. Because of this, "Mayorga's obstetrician determined that her pregnancy was high-risk, and that she needed to be closely monitored." *Mayorga*, 2012 WL 3043021 at *1. She was required to take time off for ultrasound testing which "revealed that her baby was, and would be, in a breech presentation throughout her entire pregnancy." *Id.* The plaintiff alleged that she "suffered from premature uterine contractions, irritation of the uterus, increased heart rate, severe morning sickness, severe pelvic bone pains, severe back pain, severe lower abdominal pain, extreme headaches, and other pregnancy-related conditions." *Id.* (internal quotations omitted). Mayorga alleged that she was admitted to the emergency room on three separate occasions for "severe complications relating to her pregnancy," and her doctor ordered her on bed rest for three weeks. *Id.* The court held that these allegations were sufficient to survive a motion to dismiss, writing:

> Here, Mayorga has alleged sufficient facts to state a plausible claim for relief under the ADA for a pregnancy-related complication. The Complaint alleges that Mayorga suffered from a physiological impairment—namely, that her baby was in a breech presentation and that she had significant pregnancy-related complications resulting in her three emergency room admissions and numerous pregnancy-related symptoms—and that Alorica's decision to terminate her employment was

based on these impairments. Such allegations, if proven as true, would provide Mayorga a cognizable claim under the ADA. In light of the ADAAA's lenient standards to establish a disability, and the pleading standards of Rule 8, the Court finds that Mayorga has alleged sufficient facts to state a facially plausible claim of discrimination based on an actual disability under the ADA.

*Id.* at *6.

The facts of the instant case are easily distinguishable from those in *Mayorga*. The plaintiff has provided evidence of only one incident of spotting, and only one trip to the doctor. She has produced no evidence that she experienced the kind of "pregnancy related symptoms" as the plaintiff in Mayorga.  Further, *Mayorga* was decided on a motion to dismiss, whereas this case is before the undersigned on a developed evidentiary record at summary judgment.

Further, even assuming that the plaintiff had a pregnancy related impairment, the plaintiff was not suffering from a disability unless that impairment <u>substantially limits a major life activity</u>. <u>The plaintiff fails to argue that any major life activity was so limited.</u>[51]

Finally, and tellingly, in her deposition the plaintiff stated that her condition "wasn't a disability, it was pregnant and on-the-job injury, I wasn't disabled. I was at

---

[51] As noted above, "lifting" and "working" <u>are</u> major life activities.  29 C.F.R. § 1630.2(i)(1)-(2). However, the plaintiff has made no showing that these, or any other major life activities were substantially impaired by a pregnancy related impairment.

all times physically able to work with requirements and restrictions." (Doc. 39-1 at 28(103)). She never considered herself disabled when she was at HMA. (Doc. 39-1 at 28(103)). She also stated that she was limited to light duty "solely as a result of [her] pregnancy."

Because the plaintiff was not "disabled" under the ADA, Summary Judgment is appropriate in favor of the defendants as to Counts Three and Four.[52]

> **4.      *Count Five–Title VII (Retaliation on the Basis of Sex); Count Six–the Americans With Disabilities Act (Retaliation); Count Seven–Title VII and 42 U.S.C. § 1981 (Retaliation on the Basis of Race)***

The plaintiff claims that her termination/lack of being placed in another assignment, was in retaliation for complaints and charges to the EEOC. (Doc. 53 at 9-12). The counts are brought against both defendants. As with the previous counts, these counts are "shotgun" in nature as they lump both defendants together without specifying each defendant's culpability separately. They are therefore due to be dismissed as not in compliance with this court's order of October 10, 2013 (doc. 52). FED. R. CIV. P. 41(b). Further, the same *McDonnell Douglas* analysis applies to retaliation claims whether they are brought under Title VII, the ADA, or Section 1981. *See, Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009); *Stewart v. Happy*

---

[52] As with these counts as well, summary judgment is also appropriate because the plaintiff has not argued or shown pretext.

*Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). Summary judgment is also appropriate because the plaintiff does not set out this framework, or attempt to argue it. As shown below, summary judgment is also appropriate on the merits of these claims.

"[A] plaintiff alleging retaliation must first establish a prima facie case by showing that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action." *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009) (citing *Raney v. Vinson Guard Serv. Inc.*, 120 F.3d 1192, 1196 (11th Cir.1997); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993)). In her brief, the plaintiff identifies two alleged acts of protected conduct. She states: "As noted above, [p]laintiff complained to the EEOC before her employment ended that she was being forced to use her FMLA leave though she had requested light duty." (Doc. 63 at 22). She further writes that she "additionally engaged in protected activity when she filed her second EEOC charge in November 2012." (Doc. 63 at 23).

### a.    HMA

The only alleged retaliatory conduct the plaintiff identifies in her brief is the

failure of Elwood, initially and to this date, to place her in a new position.[53] As to HMA, the plaintiff identifies no conduct, either in her complaint or brief, which it is alleged to have taken in retaliation for her complaints. The plaintiff stated in her deposition that she never contacted HMA regarding her ability to work after her FMLA leave started. (Doc. 39-1 at 82(318)); *see also* doc.62-5 at 8 (White Affidavit)). Summary judgment is appropriate in favor of HMA on Counts Five, Six, and Seven.

### b.     Elwood

The sole basis for the plaintiff's claim against Elwood is that it "terminated" her and/or has refused to place her in another assignment. However, the plaintiff is merely speculating that, because Elwood has <u>not</u> placed her into a position, that must mean that it is retaliating against her. She states that she contacted the Oxford office in February 2012, and informed it that her restrictions had been lifted and that she was available to work. (Doc. 39-1 at 55(212), 57(219)). She called back a few weeks later to ask if there were any positions available for her and was told "they would have to get back with [her] on that." (Doc. 39-1 at 57(221)). In her affidavit, the plaintiff states that, in May 2013, she "contacted the Montgomery office of Elwood Staffing Services and requested to be placed back on active status." (Doc. 64-5 at 1). She states that she

---

[53] The placing of the plaintiff on FMLA leave could not have been done in retaliation as that occurred before her complaints. Further, it is undisputed that HMA had nothing to do with the plaintiff's FMLA leave.

"received an email from Elwood on May 15, 2013 informing [her] that Elwood would contact [her] when 'an opening comes available that matches your skills and work experience.'" (Doc. 64-5 at 1-2). She states that "Elwood has not contacted me since receipt of the May 15 email." (Doc. 64-5 at 2).

Importantly, the plaintiff cannot show that any adverse employment action has been taken against her, because she has offered no evidence that, during this time, Elwood had any open positions, which matched her qualifications and experience, and which Elwood denied her because she had engaged in protected conduct. The best the plaintiff is able to do is point a section of Balmer's deposition where he states that, on a weekly basis, HMA would ask Elwood to send them a certain number of employees and that "[s]ome weeks it's zero [but] [i]t's been as many as maybe 80 in a week." (Doc. 39-2 at 9(22-23)). Nothing about this testimony narrows down how many employees HMA has actually asked for since the plaintiff left, what types of positions the employees were meant to fill, and if the plaintiff was qualified for any of those positions.[54] Too, even assuming that there were positions at HMA for which the plaintiff was qualified, and for which HMA requested employees, the plaintiff has not

---

[54] When asked about the time frame of February-March of 2012, Balmer could said he had no specific memory of whether he received any such requests. The best he could say is "typically we received communication each week regarding whether the orders are zero or any number above zero, so most likely yes, but I don't have a specific recollection of that." (Doc. 39-2 at 19(62)).

shown that she did not get the job because of her protected conduct.

Further,

[t]o establish a causal connection, the plaintiff must show that "the protected activity and the adverse action are not completely unrelated." *Davis v. Coca–Cola Bottling Co., Consol.,* 516 F.3d 955, 978 n. 52 (11th Cir.2008). To demonstrate that these two elements are not completely unrelated, the plaintiff must show that "the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomm., Inc.,* 231 F.3d 791, 799 (11th Cir.2000), *cert. denied,* 532 U.S. 1037, 121 S.Ct. 1998, 149 L.Ed.2d 1001 (2001). In other words, a decision maker cannot have been motivated to retaliate by events of which the decision maker is unaware. *Id.* Awareness, however, can be established by circumstantial evidence. *Id.*

*Butts v. Ameripath, Inc.*, 794 F. Supp. 2d 1277, 1294 (S.D. Fla. 2011). The plaintiff has not shown or argued that any persons who might have considered her for any alleged positions had any knowledge of her complaints to the EEOC.

Finally, the plaintiff has not shown that the reasons given for not rehiring her were pretextual. Elwood is entitled to summary judgment on Counts Five, Six, and Seven.

### 5.    *Count Eight–Title VII and 42 U.S.C. § 1981 (Discrimination on the Basis of Race)*

The plaintiff alleges this claim <u>only</u> against HMA. (Doc. 53 at 13). This claim is based <u>only</u> on the allegation that "Jessica" whose last name is unknown, was allowed to work "light duty" because she was pregnant while the plaintiff was not.

84

Title VII and Section 1981 disparate treatment claims are also analyzed under the aforementioned *McDonnell Douglas* burden shifting framework. *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). To establish a prima facie case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job. *Burke-Fowler*, 447 F.3d at 1323.

The plaintiff does not set out these elements, and not attempted to satisfy her burden. Further, in this case, "Jessica" is the plaintiff's only comparator, and all evidence regarding Jessica's assignments, duties, etc. will be stricken. Summary judgment in favor of HMA on Count Eight is appropriate.

### 6. *Count Nine–Ala. Code § 25.5.11.1 (Retaliatory Discharge)*

This claim is brought only against Elwood. (Doc. 53 at 14). It alleges that, after the plaintiff requested workers compensation benefits, "she was forced to go on unpaid FMLA leave and denied reasonable accommodation, after which she was not allowed to work for [d]efendants." (Doc. 53 at 14-15). The elements of this claim are: "1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of

85

the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee's on-the-job injury and the filing of a workers' compensation claim." *Alabama Power Co. v. Aldridge*, 854 So. 2d 554, 563 (Ala. 2002).  As shown above, the plaintiff did not have an "on-the-job" injury. She did <u>not</u> file a worker's compensation claim. Neither HMA nor Elwood ever treated the July 21 incident as an on-the-job injury; a First Report of Injury was never completed. Balmer stated in his deposition that he "never knew that Ms. Abbott suffered any purported on-the-job injury." (Doc. 59-5 at 4). Further, the plaintiff has not shown that the reason she has not gotten more positions was <u>because</u> she allegedly applied for workers compensation benefits. Indeed, as noted above, she did not apply for workers' compensation benefits.  Additionally, she has not shown that there were any positions available. Summary judgment in favor of Elwood is appropriate as to this claim.

## III.   CONCLUSION

Based on the foregoing, the motion to strike/objections, treated by the court as objections to the evidence offered by the plaintiff in opposition to the motions for summary judgment, shall be disposed of as noted above.  The motions for summary judgment shall be **GRANTED**, and this case shall be **DISMISSED, with prejudice**. A separate order will be entered.

**DONE** and **ORDERED** this 31st day of July, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge